**In re ANTHEM COMMUNITIES/RBG, LLC, EIN# 84–1303327, Debtor.**

**No. 01–17528 EEB.**

United States Bankruptcy Court, D. Colorado.

Sept. 28, 2001.

Garry R. Appel, Appel & Lucas, PC, Denver, CO, for Anthem Communities/RBG, LLC.

Glen E. Keller, David Graham & Stubbs, LLP, Denver, CO, for Compass Bank.

## ORDER DENYING COMPASS BANK'S MOTION TO RECONSIDER DENIAL OF STAY RELIEF MOTION

ELIZABETH E. BROWN, Bankruptcy Judge.

The Debtor is a limited liability company, formed for the purpose of developing, constructing, and marketing a luxury residential development, with 48 residences. The Debtor has completed substantially all of the development's infrastructure and common areas and sold 29 fully-constructed residences. It has sold five vacant lots to another developer. Of the remaining 14 residences, which are only partially constructed, three are subject to a first deed of trust held by Wells Fargo Bank, N.A. and the remaining 11 units are subject to a first deed of trust held by Compass Bank ("Compass" or the "Bank"). The Court

has approved an arrangement by which Wells Fargo will fund completion of construction of its three units. On the other hand, prior to the bankruptcy filing, Compass refused to provide any additional construction financing and instead declared defaults on its loans and commenced foreclosure and receivership actions in state court. Six days after the Debtor's Chapter 11 filing, Compass filed two motions: a Motion for Abstention Pursuant to 11 U.S.C. § 305 or in the Alternative for Relief from the Automatic Stay and a Joint Motion of Compass Bank and Roger L. Morgan, Receiver, to Excuse Compliance with 11 U.S.C. § 543(a) and (b). At the conclusion of the final hearing, the Court ruled in favor of the Debtor on both motions.

In its Motion for Reconsideration, the Bank asserts that the Court erred when it denied its motion for relief from stay on the basis that the Bank had failed to establish its *prima facie* case under both 11 U.S.C. § 362(d)(1) and (2).[1] According to the Bank, it was error for the Court to enter judgment *sua sponte* against the Bank, at the close of all the evidence, when the Debtor did not make a motion for the entry of judgment at the close of the Bank's case. In other words, the Bank contends that, if the respondent fails to request a directed verdict or motion for a judgment at the close of the movant's case and instead presents evidence in defense, the respondent is deemed to have waived any argument, and the court is prohibited from ruling, that the movant failed to meet its *prima facie* case. Alternatively, the Bank argues that it did present sufficient evidence to carry its burden and the Court erred by ignoring certain evidence. For the reasons set forth below, the Court denies the Bank's Motion for Reconsideration.

## I. THE APPLICABLE BURDEN OF PROOF

### A. General Principles

The Bank asserted that it was entitled to relief from stay to exercise its rights against its collateral under both Section 362(d)(1) and (2).[2] To succeed on its Section 362(d)(2) claim, it had to establish that the Debtor had no equity in this property and that the property was not necessary to an effective reorganization. To obtain relief under Section 362(d)(1), the Bank had to demonstrate "cause" for granting relief, which it asserted existed in this case because its interests were inadequately protected due to the lack of an equity cushion in the property. Thus, valuation evidence played a key role in determining both claims for relief. The Court found the valuation evidence offered by both sides to be lacking. Its ruling was based in large part on the applicable burden of proof and/or the burden of going forward with evidence.

In a hearing on a motion for relief from stay, the party requesting relief has the burden of proving a lack of equity and the debtor has the burden of proof on all other issues in stay relief matters. 11 U.S.C. § 362(g). This allocation of the burden is straightforward to apply in the context of a Section 362(d)(2) claim. The creditor must establish the lack of equity and then the burden shifts to the debtor to establish that the property is necessary for an effective reorganization. The burden is

---

1. The Motion for Reconsideration does not raise issues regarding the Court's denial of the requests for abstention or to excuse turnover by the receiver and, thus, those issues are not addressed herein.

2. Unless otherwise specified, all references to "Sections" are to sections in Title 11, United States Code.

not so simple to apply in connection with a Section 362(d)(1) claim when the basis for "cause" is the lack of an equity cushion to adequately protect the creditor. Can the creditor fail to establish lack of equity in connection with its (d)(2) claim, but then force the debtor to prove equity in order to defeat the (d)(1) claim? Clearly, the debtor has the burden of proof on the issue of adequate protection under Section 362(d)(1). If the debtor has no other means to protect the creditor, i.e. no funds to make periodic payments or other collateral to offer, does the burden immediately shift to the debtor to prove an equity cushion once a creditor has alleged "cause?" If so, this would mean that a creditor could file a motion for relief alleging cause, introduce evidence at the hearing of its secured status and then abruptly sit down, resting its case. To avoid relief entering, the typically impecunious debtor would then have to prove the existence of an equity cushion, in seeming contradiction of the allocation of the burden regarding equity in Section 362(g).

■ By distinguishing between the ultimate burden of persuasion and the initial burden of going forward, this apparent contradiction vanishes. "[A] party can bear the initial burden of going forward even if it does not bear the ultimate burden of persuasion. If it fails to carry its initial burden, the Court will dismiss its application without requiring the party that bears the ultimate burden of persuasion to offer any evidence." *In re Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bankr. S.D.N.Y.1994). Thus, before the debtor is put to its proof on the issue of adequate protection, the creditor must carry its initial burden of going forward with evidence of "cause," including a lack of adequate protection and then the burden will shift to the debtor to persuade the court that the creditor is adequately protected. *Id.; In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir.1990); *In re A & A Transp., Inc.*, 10

B.R. 867 (Bankr.D.Mass.1981); *In re Brown*, 78 B.R. 499 (Bankr.S.D.Ohio 1987).

■ How does the creditor satisfy its initial burden of going forward with evidence of lack of adequate protection? The Supreme Court has defined the secured creditor's right to adequate protection as including "the right... to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). Evidence of the erosion of the creditor's position or of a threatened erosion satisfies this initial burden.

■ The erosion may be shown through evidence of declining property values, the increasing amount of the secured debt through interest accruals or otherwise, the non-payment of taxes or other senior liens, failure to insure the property, failure to maintain the property, or other factors that may jeopardize the creditor's present position. It may be necessary to show a combination of these factors and/or to show that the circumstances as a whole are sufficient to jeopardize the creditor's interest in the property. For example, evidence of non-payment alone may not be sufficient if the collateral is a publicly-traded security that has a demonstrated track record of appreciation in value. The secured creditor's initial burden also requires that it show that the threatened harm is attributable to the stay. If the debtor farmer suffered a crop failure due to weather conditions in the year before the bankruptcy filing, but the post-petition crop is not jeopardized and crop prices remain stable, then the erosion of the creditor's position is not attributable to the stay.

## B. The Bank's Valuation Evidence

■ In the present case, the Bank's valuation evidence was insufficient to meet its burden of going forward in four respects: (a) its appraisal testimony was wholly unreliable; (b) it was based on a lump sum, "as is" valuation; (c) it demonstrated no decline in value; and (d) it did not quantify the impact of future interest accruals and senior liens.

### a. Unreliable Appraisal Testimony

The Bank introduced valuation evidence through the written appraisals and testimony of Mr. Acheson, a self-employed residential appraiser. His testimony was honest, forthright, and given in good faith, but he lacked the expertise to render this valuation. He admitted that he had never valued a partially-developed project as a whole before. He rendered the opinion that the project, as-is, was worth $3,443,500, but admitted that he found no comparables on which he could rely and that he did not use either a cost or income approach to value the project. He took an estimated retail value, valuing each unit separately on an as-completed basis and then aggregated these values, subtracted the aggregate cost of completion estimates supplied by the Debtor, subtracted a six percent marketing cost, and then subtracted $930,000, which he explained was the cost of hiring a contractor to complete construction. He could not explain how he arrived at that amount or whether this was a valid deduction, given that it was a cost that the Bank would incur if it foreclosed, but not one the Debtor would incur as the developer itself. He then factored in an estimated cost of borrowing which assumed that all costs of completion would be borrowed up front and that all units would not be sold for five or six months.

### b. Lump Sum and "As–Is" Valuation

■ The Bank's loan documentation revealed that the Bank had made eight separate loans, which presently aggregate $3,555,431.71. Each loan is collateralized by either one or two residential units. These loans were not cross-collateralized. The Bank's representative testified as to the outstanding balance of each separate loan. The Bank's appraiser, however, gave only a lump sum valuation for the 11 units as a whole and testified that he could not breakdown this figure. Since these loans were not cross-collateralized, it was imperative that the Bank introduce evidence as to the value of the specific collateral securing each of the eight loans. In the interest of justice, the Court brought this issue to the attention of the Bank during the course of trial and offered to let it put on additional evidence, which the Bank declined.

■ The Bank argued that the Court must value the project on an "as is" basis, as opposed to an "as-completed" value, relying on *In re Swedeland Dev. Group, Inc.,* 16 F.3d 552 (3rd Cir.1994). In *Swedeland,* given the state of the construction yet to be completed, the debtor would not be able to pay the lender until nine years later. Under those circumstances, the court found an "as-completed" valuation too speculative. Whether it is proper to rely on an "as-completed" valuation depends on the circumstances of the case. *In re Ledgemere Land Corp.,* 125 B.R. 58 (Bankr.D.Mass.1991).

In this matter, all of the Compass units are more than one-half completed and many are 80 to 90 percent completed. No one disputed that the property would increase in value more than the cost of completion if construction was completed. The project was sufficiently complete that the Bank's own appraiser felt that he could arrive at an as-completed value. While the appraiser found no comparables for valuing the project "as-is" as a whole, his appraisals were prepared based on an "as-

completed" basis for each unit separately, with many comparables utilized to establish these values. Apparently the Bank did not like the conclusion these individual "as-completed" appraisals reached, because each separate appraisal had added to the end of it, as an afterthought, a concluding paragraph that gave a lump sum "as-is" valuation for all units. Under these circumstances, the as-completed values provided by both the Debtor's representative and contained in the Bank's own appraisals were more reliable indications of value than the self-serving conclusory "as-is" valuation at the end of the appraisals and which formed the basis for the appraiser's testimony.

Nevertheless, even if an "as-is" valuation was appropriate, the Bank failed to present evidence of the "as-is" computation on a per unit, per loan basis. In its closing arguments, the Bank attempted to argue how the Court could arrive at such a valuation, using the as-completed value and multiplying it by the applicable percentage of completion for each unit. In other words, if Unit A is 80% complete, it argued that the Court should multiply its as-completed value by 80%. In its Motion for Reconsideration, the Bank argues that "there is authority" for this formulaic approach, but it declined to recite any such authority or to produce any such evidence. It argued further that the computations which it passed out at closing, utilizing this formula, were not new evidence, but simple mathematical computations. While simple math supplied in a demonstrative chart at closing may not be a matter of new evidence, the propriety of utilizing a particular formula for valuation purposes is a matter of new evidence. In response to the Court's own questioning, Mr. Acheson testified that he could not breakdown his own "as-is" lump sum valuation into separate "as-is" unit valuations. If the Bank's own appraiser cannot do it, it cannot be a matter of "simple math." Cer-

tainly, the Bank cannot introduce new valuation evidence in its closing arguments. Arguments of counsel cannot take the place of evidence lacking in the record. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *United States v. Meienberg*, 263 F.3d 1177 (10th Cir.2001); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir.2001); *In re Valley Park, Inc.*, 217 B.R. 864 (Bankr. D.Mont.1998); *In re Mayville Feed & Grain, Inc.*, 96 B.R. 755 (Bankr.E.D.Mich. 1989).

### c. No Decline in Value

Nothing in either the testimony or the appraisals offered by the Bank demonstrated a threatened decline in the value of the property. The Bank's appraiser testified that the market for these units has "slowed down some," that a larger number of homes is on the market now, and consequently he did not believe that the large percentage of appreciation in value reflected in the past year would continue. Instead he expects that the market will achieve "equilibrium" and that prices will stabilize. In the appraisals themselves, however, he stated that, throughout the Denver metro area, including the subject market area, the market appears to be experiencing a "slow increase in values." He also said, "[t]he average appreciation within the metro area during the past 12 months based on median sales prices has been approximately 13.8 percent.... The overall economic activity within the metro area appears to be steady with a low unemployment rate and a stable general population." Thus, while he does not project large appreciation in the near future, he is projecting a slow increase in values. Several memoranda of the Bank's representatives admitted into evidence also reflect the Bank's belief that this project has enjoyed substantial appreciation in value.

The Debtor's principal, Mr. Crow, gave valuation testimony based on existing contracts with buyers for the individual residences that were entered into more than one year ago and he then adjusted the sales prices in these contracts to reflect an increase of 12 to 18 percent. Mr. Crow believes he can reject these existing contracts as executory in order to enter into more favorable contracts, reflecting current market rates. The Debtor has tendered no written contracts to establish the increases nor has it produced any existing or prospective buyers to testify that they are even considering paying this increase. The Debtor bases its value on Mr. Crow's expertise "for 30 years in this business, selling over $200 million of product," which is as specific as his testimony was on how he arrived at these figures. However, the Bank's own memoranda corroborate this belief in an increase in value. Mr. Acheson's appraisals indicate at least a 13.8 percent increase in value in the Denver metro area generally in the past 12 months. Mr. Acheson further testified that this project represents a fairly unique type of residence, which has been in high demand in the Denver area. As a result, the Court is left with the undisputed fact that this property is increasing in value at some rate. Does anyone expect that the increases in property values will go on forever or be as large as they have been in recent years? It is doubtful simply as a matter of common sense and general observation. Post-hearing events, most notably the tragedies of September 11, 2001, may have a long-term impact on the economy and, consequently, on this real estate market. At present, however, the Court has no expert testimony before it to substantiate a decline in value.

### d. Interest Accruals, Real Property Taxes & Mechanic's Liens

Decline in value is only one way to show that the stay is eroding a secured creditor's position. Future interest accruals, property taxes and mechanic's liens are relevant to the extent that they demonstrate a post-petition erosion of the creditor's secured claim. If hidden liens and/or lack of equity existed pre-petition, then they do not reflect erosion that is attributable to the stay. In this case, the Bank demonstrated that a relatively small amount of mechanic's liens and unpaid real property taxes exist. These hidden, senior liens existed pre-petition. The Bank did not show that the continuation of the stay will cause further liens or unpaid taxes, with the exception of post-petition interest accruing on the real property taxes ahead of the Bank's position. The amount of these taxes and related interest, however, is *de minimus*.

In regard to the accrual of post-petition interest, the Court agrees with the Bank that this is a relevant factor only if there is equity in the property. Section 506(b) provides for the allowance of post-petition interest only to the extent that the secured creditor is oversecured. *If* there is no equity in the Debtor's property, then the Bank is not entitled to adequate protection to cover future interest accruals. *If* there is equity, then post-petition interest is one factor for the Court to consider in determining whether the stay is eroding the secured creditor's interest.

▪ The Bank argues that because it has established a lack of equity, it is not entitled to accrue post-petition interest and, therefore, evidence of interest accruals is irrelevant. For the reasons stated above, the Court finds that the Bank failed to establish a lack of equity. Thus, evidence of future interest accruals has some bearing on the issue of lack of adequate protection and whether the secured creditor's interest is eroding. In its oral ruling on the motion for relief from stay, however, the Court stated that the Bank had failed to introduce any evidence regarding

the accrual of future interest and the impact of such on the Bank's secured position. The Court noted that the Bank's loans provided for variable rates of interest and, thus, the Court could not make these computations itself. In its Motion for Reconsideration, the Bank contends that the Court erred in this finding because one of many exhibits attached to a particular exhibit contained a computation of interest and a per diem rate. The Court has verified that Exhibit K to Exhibit A, which was admitted into evidence, does contain this information. The Court warned the parties at the outset of trial not to rely on information buried in voluminous records and to bring to the Court's attention anything contained in the documents which the parties believed to be critical to their cases. While the Bank failed to present this evidence regarding interest accruals through either testimony or in closing, the Court acknowledges it is contained in a document admitted into evidence and the Court will not ignore it, simply because the Bank failed to bring it sufficiently to the Court's attention at trial.

Although there is evidence now brought to the Court's attention of the accrual of future interest, which may be some evidence of a decline or erosion in the Bank's position, the Court finds it to be insufficient by itself to satisfy its burden of going forward with evidence of "cause." The Bank has not addressed in any fashion to what extent the proposed payment by the Debtor of at least $335,000 from the sale of Unit 344 in the very near future alleviates some of the erosion that will occur due to the accrual of future interest. More importantly, it has not shown how the accrual of interest will or will not be offset by the future increases in the value of the property discussed above.

### C. Failure to Satisfy Initial Burden

 In regard to its Section 362(d)(2) claim, the Bank failed to estab-

lish a lack of equity due to the deficiencies noted above in subsections (a) and (b). In its Motion for Reconsideration, the Bank notes some of the deficiencies in the valuation testimony given by the Debtor's principal and contends that the Court erred in its calculations of equity. Assuming for the sake of argument that the Bank established a lack of equity, the Bank is still not entitled to relief. The Court found that the property is necessary for an effective reorganization and the Bank has not challenged this finding in its Motion for Reconsideration.

Thus, disposition of this matter hinges on whether the Bank satisfied its initial burden under Section 362(d)(1). This burden required the Bank to demonstrate an erosion or threatened erosion of its secured position in order to shift the burden to the Debtor. As noted in subsection (c) above, the Bank offered no evidence of a decline or threatened decline in value. As noted in subsection (d), the Bank did establish the rate of future interest accruals, in the event that there is equity and it also showed a relatively modest amount of unpaid taxes and mechanic's liens filed against the units. It did not, however, show how these factors have caused or will cause an erosion of its secured position that is attributable to the automatic stay. Taken as a whole, the Bank's evidence failed to satisfy its initial burden of establishing "cause."

### II. WAIVER BY THE DEBTOR

 In its Motion for Reconsideration, the Bank argues that the Debtor waived any argument that the Bank failed to satisfy its prima facie case by presenting evidence in defense before making a motion for a judgment. It cites I Tiller, *Wigmore on Evidence* § 108 (1983) as its only authority for this proposition. This section

from *Wigmore*, however, is a very general and lengthy section concerning the need to timely object to the admissibility of evidence to preserve the issue on appeal. Although literally thousands of cases are cited for this general proposition, the Bank refers this Court to no case law authority that supports its more narrow contention that the Debtor has waived its right to argue the Bank's failure to satisfy its initial burden.

As noted in the Debtor's Response, the former Rule 41(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7041 provided that:

> After the plaintiff . . . has completed the presentation of his evidence, the defendant . . . may move for dismissal. . . . The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

Thus, former Rule 41(b) required a motion for a directed verdict to be made at the conclusion of the plaintiff's case. The consequence of failing to make a timely motion, however, was that the defendant was deemed to have waived the right to make a Rule 41(b) motion and the right to challenge the denial of a Rule 41(b) motion on appeal. *In re Scialdone,* No. 87–02338–N, 1988 U.S. Dist. LEXIS 18645 (U.S.D.C. E.D. Va. June 9, 1988). Consequently, under the former rule, the defendant was "relegated to challenging whether all the evidence, rather than just the plaintiff's evidence, was sufficient to support the judgment." *Wealden Corp. v. Schwey,* 482 F.2d 550, 552 (5th Cir.1973); *see also Sanders v. Gen. Servs. Admin.,* 707 F.2d 969 (7th Cir.1983).

The Federal Rules of Civil Procedure were amended in 1991 to, among other things, eliminate this aspect of Rule 41(b) and to adopt in its place Fed.R.Civ.P. Rule 52(c), which now provides:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue or the court may decline to enter any judgment until the close of all the evidence.

The new rule does not contain language requiring a motion at the close of the plaintiff's evidence. Again, the Bank has not provided any authority to support its waiver argument. The 1983 edition of *Wigmore* certainly does not address the 1991 change in the rules.

### III. *SUA SPONTE* POWER OF THE COURT

■ Finally, the Bank argues that the Court ·cannot render a judgment *sua sponte* based on the movant's failure to satisfy its initial burden. The Bank is correct that this places the Court in the unfortunate role of advocating a party's position. While it may be unfortunate, the Bank refers this Court to no authority supporting its position that the Court cannot act *sua sponte.* In the cases cited in Section I above which dismissed the stay relief motion on the basis that the movant failed to meet its burden of going forward, there was no mention of a motion by the debtor for a judgment at the conclusion of the creditor's case and, thus, those courts most likely acted *sua sponte.* Fed. R.Civ.P. Rule 52(c) expressly allows the *court* to enter judgment as a matter of law once a party has been fully heard on its claims/defenses. It allows the court to do so at "half time" or at the close of all the evidence. Unlike the former rule, it does not mention the need for the defendant to move for dismissal. In a different factual context, the Fifth Circuit has expressly ruled that the trial court may properly

dismiss a plaintiff's case *sua sponte* under Rule 52(c) due to a plaintiff's failure to establish its *prima facie* case. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* No. 98–7493, 1999 WL 132178, 1999 U.S.App. LEXIS 3832 (2nd Cir. Mar. 9, 1999)(unpublished decision); *see also JPM, Inc. v. John Deere Indus. Equip. Co.,* 934 F.Supp. 1043 (U.S.D.C.W.D.Wis.1995) *aff'd,* 94 F.3d 270 (7th Cir.1996); *Curley v. Perry,* 246 F.3d 1278 (10th Cir.2001)(court can *sua sponte* dismiss claims under Rule 12(b)(6) when it is patently obvious plaintiff could not prevail on the facts alleged); *Link v. Wabash R.R. Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)(long-recognized power of the federal courts acting *sua sponte* to dismiss cases for lack of prosecution).

■ If the Court was unable to act *sua sponte,* then it could be forced to rule in favor of a creditor who seeks relief from stay, but presents *no* evidence. Without evidence, the creditor would lose its claim for relief under Section 362(d)(2), but under Compass' reasoning, it would automatically win its Section 362(d)(1) claim, unless the debtor made a motion for a directed verdict or established adequate protection. Other courts have been unwilling to follow Compass' reasoning. In *In re Tursi,* 9 B.R. 450 (Bankr.E.D.Pa.1981), the creditor sought relief from stay under both Section 362(d)(1) and (2) on the factual basis that the debtor lacked any equity in the property. The court found that neither party had presented any credible evidence. It then ruled that the bank had failed to satisfy its burden of proof on the issue of lack of equity and, therefore, it was not entitled to relief under either statute. Nowhere in this decision is there a reference to a motion for a judgment at the conclusion of the creditor's case and, in fact, the debtor had presented evidence in defense, albeit incompetent evidence. "[I]n the all too typical instance in our Court, which has played itself out in this case, where the

'record' presented is limited to arguments of counsel and no evidence is presented, it is the *Debtor* rather than the party seeking relief from the stay who must prevail." *In re Stranahan Gear Co., Inc.,* 67 B.R. 834, 837 (Bankr.E.D.Pa.1986). This result is justified because the imposition of the automatic stay and the breathing space it provides to the debtor is one of the fundamental tenets of the Bankruptcy Code. It should not be set aside absent a showing of "cause." This is especially true in the early stages of a bankruptcy proceeding.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that the Bank failed to satisfy its initial burden under both Section 362(d)(1) and (2). It was not improper for the Court to act *sua sponte* in rendering a judgment against the Bank on this basis after the conclusion of all the evidence. Accordingly, the Bank's Motion for Reconsideration is denied. The automatic stay remains in effect with respect to the subject property.