**In re WEBBER, David J. and Linda S., Debtors.**

No. 02–01511–R.

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 13, 2004.

Timothy T. Trump, Conner & Winters, Tulsa, OK, for Debtor.

Jim Timberlake, Richard Chapman, Baer & Timberlake, P.C., for Movant (Principal Residential Mortgage, Inc.).

### ORDER DENYING MOTION FOR RELIEF FROM AUTOMATIC STAY AND ABANDONMENT OR ALTERNATIVELY SEEKING ADEQUATE PROTECTION

TOM R. CORNISH, Bankruptcy Judge.

Before the Court is the Motion for Relief from Automatic Stay and Abandonment of Property, or Alternatively Seeking Adequate Protection and Brief in Support Thereof ("Motion"), filed by Principal Residential Mortgage, Inc. ("PRM") on April 30, 2004 (Doc. 59) and the Objection to Motion for Relief from the Automatic Stay and Abandonment ("Objection"), filed by Debtors David J. and Linda S. Webber (the "Webbers") on May 13, 2004 (Doc. 61). A preliminary hearing was held on June 16, 2004. A final hearing was held on August 4, 2004, at which appeared Richard Chapman, counsel for PRM, and Timothy Trump, counsel for the Webbers. Mr. Webber also appeared and testified. The Court admitted PRM's Exhibits 1 and 2 and the Webbers' Exhibits 1–7 without objection. The Court takes judicial notice of pleadings filed in this case that establish the history of the dispute between PRM and the Webbers concerning payment of the mortgage at issue.

Upon consideration of the record, the Motion and Objection, the testimony of Mr. Webber, the exhibits admitted, the briefs and oral arguments of counsel, and the applicable law, the Court finds and concludes as follows:

### Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(G); and Miscellaneous Order No. 128 of the United States District Court for the Northern District of Oklahoma: Order of Referral of Bankruptcy Cases effective July 10, 1984, as amended.

### Findings of fact and conclusions of law

On or about December 5, 1991, the Webbers executed a note payable to PRM's predecessor in interest, United Savings Association of Texas FSB, in the original principal amount of $49,097.00, with a maturity date of January 1, 2022 (the "Note"). PRM Exhibit 1. The Note required monthly payments of principal and interest (at the annual rate of eight percent) in the amount of $360.26 which were due on the first day of each month. *Id.*, ¶ 4. The Note provided for a late charge for overdue payments as follows: "If Lender has not received the full monthly payment required by the Security Instrument, as described in Paragraph 4(C) of this Note by the end of fifteen calendar days after the payment is due, Lender may collect a late charge in the amount of FOUR per cent (4.00%) of the overdue amount of each payment." *Id.*, ¶ 6(A). The default clause of the Note provides:

> If Borrower defaults by failing to pay in full any monthly payment, then Lender may, except as limited by regulations of the Secretary [of Housing and Urban Development] in the case of payment defaults, require immediate payment in full of the principal balance remaining due and all accrued interest.... This note does not authorize acceleration when not permitted by HUD regulations.

*Id.*, ¶ 6(B). In the event that the Lender properly accelerates the Note, it "may require Borrower to pay costs and expenses including reasonable and customary attorneys' fees for enforcing this Note. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note." *Id.*, ¶ 6(C).

Contemporaneously with the Note, the Webbers executed a mortgage on real property located at 1009 North Cedar Street, Owasso, Tulsa County, Oklahoma (the "Property"), to secure the indebtedness represented by the Note. PRM Exhibit 2 (the "Mortgage"). The Webbers occupy the Property as their principal residence. The Mortgage requires the Webbers to pay when due the principal and interest on the debt evidenced by the Note, late charges due under the Note, and prorated installments of property taxes and property insurance. The default clause of the Mortgage provides that "Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if: (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or (ii) Borrower defaults by failing for a period of thirty days, to perform any other obligations contained in this Security Instrument." *Id.,* ¶ 9. The Mortgage further provides that—

> Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent there are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations it secures shall remain in effect as if Lender

had not required immediate payment in full. . . .

*Id.,* ¶ 10.

The Webbers filed for relief under Chapter 13 of the Bankruptcy Code on April 1, 2002, and their Fourth Amended Chapter 13 Plan, filed on August 15, 2002 (the "Plan") (Doc. 34) was confirmed on August 21, 2002. The Plan provides for payment to PRM of an arrearage of $10,840.36, with interest at the rate of eight percent over a 60 month period. The Webbers were to continue to pay the balance due on the Note of $44,561.36 by making regular monthly mortgage payments directly to PRM outside the Plan.

In its Motion, PRM alleges that as of April 30, 2004, the Webbers were in default of the Note and Mortgage. PRM states "[a]s of April 30, 2004, the loan is due for the May 1, 2002[sic] and subsequent payments with an outstanding principal balance of $42,848.67 plus accruing interest, attorney fees, costs and expenses, and other allowable charges." Motion, ¶ 4. PRM also alleges—

> Default has also been made in the Debtor's Chapter 13 Plan which was confirmed on June 29, 1999 [sic—the Plan was confirmed on August 21, 2002]. Specifically, the Debtors have failed to make the April, 2002, and subsequent post-petition mortgage payment due Movant as required by the Confirmed Chapter 13 Plan. As of May 13, 2002, [sic] the following amounts are required to bring the Debtors current in their post-petition mortgage obligation:

| Ongoing Monthly Mortgage Payments: | |
| --- | --- |
| 12/03 to 4/04 at $479.68 each | $2,398.40 |
| Late Charges | 72.05 |
| Attorney Fees | 650.00 |
| Bankruptcy Court Costs | 150.00 |
| Amount necessary to cure plan default as of March 26, 2004 [sic] | $3,270.45 |

*Id.,* ¶ 5.

The Webbers contend that they are not in default, either on their Plan payments

or on their obligation to make payments to PRM outside the Plan. The Webbers assert that they have equity in the Property and that PRM is adequately protected. In support of their position, the Webbers offered Mr. Webber's uncontroverted testimony that he had made all mortgage payments since the Plan was confirmed, and offered exhibits, including bank statements from First Nation Bank of Owasso, that demonstrate that Mr. Webber wrote and presented the following checks to PRM or its attorneys:

| Webber Exh. No. | Check No. | Date of Check | Amount |
|---|---|---|---|
| 1 | 5725 | 11/20/03 | $494.09 |
| 2 | 5730 | 12/11/03 | $494.09 |
| 4 | 5734 | —— | $494.09 (lost by PRM) |
| 3 | 5736 | 01/26/04 | $988.18 (notation: "Nov., Dec. 2003") (lost by PRM) |
| 7 | 5739 | 02/10/04 | $496.74 |
| 7 | 5743 | 03/13/04 | $511.15 (includes a late charge) |
| 7 | 5747 | 04/14/04 | $511.15 (includes a late charge) |
| 7 | 5750 | 05/06/04 | $496.79 |
| 6 | 5751 | 05/06/04 | $473.09 (replacement for 5734 which was lost by PRM) |
| 6 | 5752 | 05/06/04 | $967.18 (replacement for 5736 which was lost by PRM) |

The exhibits indicate that PRM received checks 5725 ($494.09) and 5730 ($494.09) in December 2003 but did not cash them at that time. Instead, PRM forwarded the checks to its attorneys, Baer & Timberlake, P.C., because the "loan [had] been referred to [the attorneys'] office to file a Motion for Relief." Webber Exhibits 1 and 2. On or about February 18, 2004, the Webbers' attorney, Mr. Trump, sent Check 5736 in the amount of $988.18 to Jim Timberlake. Mr. Timberlake's paralegal then forwarded checks 5734 ($494.09) and 5736 ($988.18) to PRM on February 26, 2004, by Federal Express. In a letter dated April 5, 2004, Mr. Timberlake's paralegal suggested to Mr. Trump that Mr. Webber check his bank statements to determine whether these checks had cleared because "[a]lthough [the firm]

ha[d] proof that the FedEx envelope was signed for by someone at Principal, [Principal] do[es] not show that these funds were ever posted to [the Webbers'] loan." Webber Exhibit 4. If the checks had not cleared, PRM requested that Mr. Webber stop payment on the lost checks and issue substitute checks. *Id.*

On April 30, 2004, Mr. Timberlake filed the Motion on behalf of PRM, contending that the Webbers were in default on payments due from December 2003 through April 2004 and that PRM had incurred attorney fees and costs in filing the Motion. The Court finds, however, that the Webbers made payments every month as required, and that PRM either negligently failed to apply the payments or lost the payments.

On May 3, 2004, Mr. Trump advised Mr. Timberlake that Mr. Webber had confirmed that the check for $988.18, which PRM had received but lost, had not cleared his account and that Mr. Webber was willing to write a replacement check if PRM agreed to pay the fee required to stop payment on the lost check; withdraw the Motion; and waive costs and fees. Webber Exhibit 5. In response, PRM contended that it had not received the April 2004 payment (which, according to Webber Exhibit 7, indicated a receipt stamp of April 21, 2004, although it was not presented by PRM to the Webbers' bank until May 24, 2004), but in any event, PRM was willing to withdraw its Motion and waive fees if the Webbers replaced the lost checks and provided proof that the April and May payments had been made. *Id.* On May 10, 2004, Mr. Trump's office sent Mr. Timberlake check 5751 in the amount of $473.09 and check 5752 in the amount of $967.18, which represented the amounts of the lost checks less $21, which was deducted to offset the "stop payment" fee incurred by the Webbers.

Notwithstanding that the Webbers complied with the demands of PRM to replace checks that PRM lost, and to supply proof that they had paid their April and May installments, PRM did not see any reason to withdraw its Motion and remains steadfast in asserting that the Webbers are in default and that stay modification is appropriate.

█ PRM argues that it seeks relief solely under Section 362(d)(1) of the Bankruptcy Code for "cause including the lack of adequate protection of an interest in property of such party in interest," and that it is *not* seeking relief under Section 362(d)(2), which requires modification of the stay if the debtor does not have equity in the property and does not need the property for an effective reorganization. The burden of proof in connection with a motion for relief from the automatic stay is a shifting one. *See Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.),* 907 F.2d 1280, 1285 (2d Cir.1990). Although Section 362(g) provides that the movant has the burden of proof on the issue of equity (when seeking relief under Section 362(d)(2)), and the party opposing the relief has the burden on all other issues including adequate protection, under Section 362(d)(1), the moving party has the burden of going forward with an *initial showing of cause. See id. See also In re Anthem Communities/RBG, LLC,* 267 B.R. 867, 871 (Bankr.D.Colo.2001) ("before the debtor is put to its proof on the issue of adequate protection, the creditor must carry its initial burden of going forward with evidence of 'cause,' including a lack of adequate protection and then the burden will shift to the debtor to persuade the court that the creditor is adequately protected"). If the movant satisfies its initial burden of showing cause, the burden shifts to the debtor to produce evidence that the creditor's collateral is not declining in value or that the creditor is adequately protected either through payments, an equity cushion, additional or replacement liens, or good prospects for a successful reorganization. *Id.* If the movant fails to make an initial showing of cause, however, the debtor has no obligation to present any evidence, and the motion for relief from the automatic stay must be denied. *See Sonnax Industries,* 907 F.2d at 1285.

█ PRM alleges that cause exists for modification of the stay because the Webbers are in default of the Note and Mortgage. At the hearing, however, PRM did not submit one shred of evidence to support its allegations that the Webbers failed to pay installments due from December 2003 to April 2004, or that the Webbers failed to pay late fees. In fact, the Webbers' exhibits, which were admitted without objection or qualification by PRM, clearly indicate that PRM *acknowledged receipt* of the February 2004 and March 2004 payments (Webber Exhibit 5) and *admitted* to losing checks in the amount of $988.18 and $494.09, presumably payments for November 2003, December 2003 and January 2004 (Webber Exhibit 4 and 5). Further, because the Webbers were not delinquent at the time of the Motion, or if they were, such delinquency was the fault of PRM's failure to properly apply and account for payments, PRM was not entitled to assess attorney fees or costs against the Webbers or to add such fees and costs to the outstanding loan. Nor did PRM present any evidence that the Webbers were in default of their Plan payments. Mr. Webber also testified that there was equity in the Property. The Court specifically finds that PRM's Motion was filed without a reasonable investigation. In fact, the Court now finds after conducting this trial that there was no

legal or factual basis for continuing this litigation.

■ The Court concludes that PRM did not establish "cause" and is therefore not entitled to relief from the automatic stay. Because the Webbers reside in the Property, the Property is not of inconsequential value and is not burdensome to the estate, and it is necessary for the Webbers to maintain the Property in order to successfully reorganize, a condition that constitutes a benefit to the estate. Thus PRM has not established grounds for abandonment of the Property under Section 554 of the Bankruptcy Code. Finally, because the Court finds that the Webbers are gainfully employed and have been faithfully making their monthly mortgage payments, the Court concludes that PRM's security interest in the Property is adequately protected.

Although this appears to be Mr. Timberlake's Motion, Richard Chapman appeared as trial counsel. The Court recalls Mr. Chapman arguing that if the Court was inclined not to grant PRM's motion for relief, PRM would probably just file another motion. If this is the case, so be it. However, PRM is on notice that filing a subsequent motion against the Webbers that is as specious as the present one from a merits standpoint may subject PRM and/or its counsel to the assessment of costs and fees.