In re LAKE STATES COMMODITIES, INC. a/k/a Lake States, Inc., Debtor.

Thomas W. Collins, Debtor.

Lawrence Fisher, as Trustee of the Estate of Lake States Commodities, Inc., a/k/a Lake States, Inc., and as Trustee of the Estate of Thomas W. Collins, Plaintiff,

v.

Prime Table Restaurant & Lounge, Inc., Defendant.

Bankruptcy Nos. 94 B 12123, 94 B 12125. Adversary No. 96 A 00760.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 11, 2002.

Michael J. Koenigsknecht, Chicago, IL, for Plaintiff.

Dean Gournis, Chicago, IL, for Defendant.

Lawrence Fisher, Chicago, IL, trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SUSAN PIERSON SONDERBY, Chief Judge.

### I.

### FINDINGS OF FACT

This cause comes to be heard upon the conclusion of the plaintiff's case-in-chief at the joint trial on common issues; whether the debtor Lake States Commodities, Inc. a/k/a Lake States, Inc. ("Lake States") was insolvent at the relevant time pursuant to statute and whether Lake States was operated as a Ponzi scheme. For the reasons stated herein, judgment in favor of the defendant Prime Table Restaurant & Lounge, Inc. ("Prime Table") is entered pursuant to Rule 7052(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

#### A. *Background*

1. On June 16, 1994 (the "Petition Date"), involuntary petitions for relief under chapter 7 of title 11 of the United States Code (the "Code") were filed against Lake States and Thomas W. Col-

lins ("Collins"). Lake States and Collins are sometimes collectively referred to as the "Debtors." Orders for relief under chapter 7 of the Code were entered in both cases. On July 13, 1994, this Court ordered the substantive consolidation of the estates pursuant to Bankruptcy Rule 1015.

2. Lakes States, an Illinois corporation, whose principal place of business was located in Rolling Meadows, Illinois, was in the business of soliciting investors for commodity futures trading and participating in commodity pools. Collins, who is now deceased, was a resident of Illinois and was president and a shareholder of Lake States. Collins' brother, Edward Collins, was a vice-president of Lake States.

3. William A. Brandt, Jr. was appointed to serve as interim chapter 7 trustee on July 14, 1994 (the "Interim Trustee"). Lawrence Fisher (the "Trustee") was elected to serve as chapter 7 trustee on October 26, 1994, and continues to serve in that capacity.

4. During his brief tenure, the Interim Trustee retained KPMG Peat Marwick, LLP ("KPMG") to render accounting services on behalf of the estates. Upon his election, the Trustee continued the retention of KPMG. KPMG disbanded and the Trustee continued the retention of the former KPMG accountants who became employed by Ernst & Young.

5. On June 14, 1996, the Trustee filed a number of adversary complaints against investors in Lake States, seeking to recover payments made by Lake States to the defendants as fraudulent conveyances under Sections 548(a)(1)(A) and (a)(1)(B) of the Code and Sections 5(a)(1), 5(a)(2) and (6) of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.* ("UFTA"), applicable here by reason of the Trustee's avoiding powers under Section 544(b) of the Code. Many of the fraudulent transfer adversary proceedings were settled, leaving 21 proceedings, including this adversary proceeding, remaining (the "Remaining Adversary Proceedings").

6. On January 25, 2001, this Court ordered that a joint trial of the issues common to the Remaining Adversary Proceedings be conducted on May 7, 2001. The central issues at trial were whether Lake States was insolvent at the relevant time and whether Lake States was operated as a Ponzi scheme.

7. Dean Gournis, Brian L. Shaw and Robert M. Fishman (collectively, "Counsel") filed appearances on behalf of Prime Table and Prime Table filed an answer to the complaint on October 25, 1996. Shaw and Fishman were given leave to withdraw their appearances on March 21, 2000.

8. Prime Table did not attend the joint trial. The defendants who participated in the joint trial are collectively referred to as the "Defendants."

## B. *Evidence at the Trial*

9. At the trial, the Trustee attempted to introduce evidence during his case-in-chief via the following means: the testimony of the Trustee; four documents; the testimony of the Trustee's expert Kenneth J. Malek ("Malek"); and the expert's report. The four documents, which are defined and discussed in detail below, are the KPMG Report, the Net Cash Report, and the Indictment and Criminal Docket from the criminal proceedings against Edward Collins.

### (i) *The Trustee's Testimony*

10. At the trial, the Trustee testified regarding Lake States' business operations, particularly the details concerning Lake States' solicitation of investors and the manner in which Lake States paid its investors.

11. The Court sustained the Defendants' objections and excluded the Trustee's testimony under Rule 602 of the Federal Rules of Evidence (F.R.E.) because the Trustee lacked personal knowledge of Lake States' business operations.

### (ii) *The KPMG Report and the Net Cash Report*

12. During his testimony, the Trustee discussed the following documents:

(i) certain of Lake States' financial documents, including: (a) canceled checks; (b) cash receipts; (c) cash disbursements; (d) cash ledgers; (e) bank statements; (f) investor files [1] containing: promissory notes, participation certificates for commodity pools, monthly roll-forward statements detailing cash balances, correspondence, and ledger sheets; (g) a report titled "Net Cash Position Roll Forward," which purported to summarize each investor's investment activity (the "Net Cash Report"); and (h) account statements with the Iowa Grain and Geldermann, Inc. clearing firms (the "Clearing Firm Account Statements") (items (a) through (h) are collectively referred to as the "Business Records"); and

(ii) a report prepared by Ford Phillips ("Phillips"), an employee of KPMG, which summarized the Clearing Firm Account Statements and other Business Records (the "KPMG Report").

13. The Interim Trustee delivered the Business Records to the Trustee, who in turn delivered the Business Records to KPMG for review and analysis. The Trustee had no personal knowledge of and did not assist in any way in the preparation or maintenance of the Business Records.

14. The Trustee testified regarding the results of KPMG's review and analysis of the Business Records and the contents of the KPMG Report. The Court sustained the Defendants' objections and excluded the Trustee's testimony under F.R.E. 602 because the Trustee lacked personal knowledge of these matters.

15. The Trustee sought the introduction of the KPMG Report and the Net Cash Report into evidence.

16. In this regard, on cross-examination, the Trustee noted that he did not cause the issuance of subpoenas directed to any of the several former employees of Lake States who may have had personal knowledge of Lake States' business or who could have laid a foundation for the introduction of the Business Records. The Trustee confirmed that he did not receive any affirmative indication that any of the former employees would refuse to testify in response to a subpoena, although he doubted that they would testify.

17. The Trustee did not call Phillips or any other former employee of KPMG to testify about the KPMG Report or KPMG's review of the Business Records. The Trustee did not call any bank or clearing-account firm employees to lay a foundation for the Clearing Firm Accounts or bank records.

18. During the direct examination of the Trustee and in the face of continuing objections by the Defendants to the admission of the KPMG Report and the Net Cash Reports into evidence, the Trustee's counsel indicated that he would attempt to lay the foundation for the admission of the KPMG Report and the Net Cash Report through the Trustee's expert witness.

---

**1.** The Trustee testified that there are 310 claims against the estates in the aggregate amount of $48.6 million filed by persons who characterize themselves as investors. The Trustee could not verify that there was an investor file for every Lake States investor.

19. Rather than using the expert witness, however, the Trustee was recalled to the witness stand to try to lay the foundation for the KPMG Report and Net Cash Report. Again, foundation objections were raised by the Defendants and sustained by the Court. As a result, the KPMG Report and the Net Cash Report were not admitted into evidence.

### (iii) *The Expert's Testimony and Report*

20. Malek was retained by the Trustee as an expert to provide opinions regarding whether a Ponzi scheme existed and whether Lake States was insolvent. At the trial, Malek tendered his report which contained statements of his opinions, a description of the sources and basis of his opinions, and his *curriculum vitae* (the "Malek Report").

21. Malek is a certified public accountant and a certified insolvency and restructuring advisor with over 20 years of experience specializing in insolvency, restructuring, and workout situations. Malek is a director of Navigant Consulting, Inc. ("Navigant"), an international, publicly traded consulting firm with offices in more than fifty cities nationwide and seventeen offices located overseas. Malek is a Fellow of the American College of Bankruptcy and he, at the time of the trial, was the immediate past president of the Association of Insolvency and Restructuring Advisors. Malek has testified in numerous bankruptcy cases, primarily in this District, as an expert giving opinions on such issues as insolvency; valuations of real estate, stock interests, and business enterprises; and plan feasibility. Malek was retained in prior cases to render opinions involving three separate Ponzi schemes.

22. In the Malek Report, Malek opined about the accuracy of the KPMG Report:

"The KPMG Peat Marwick data base contains over 11,598 transactions, obtained from prepetition bank records, check registers, investor rollforwards maintained by Lake States personnel and other records analyzed by KPMG Peat Marwick. Navigant tested the accuracy of the KPMG Peat Marwick data base by tracing and agreeing a sample of cash transactions reported therein to and from the bank statements and other records. The only exception noted in this testing was that an aggregate $202,000 deposit of funds received from three investors on February 27, 1999, was shown as a $102,000 deposit from only two of such investors. The effect of this one error was to understate the liability to investors derived from the KPMG Peat Marwick data base. No other errors were detected. Based on the extent of additional testing conducted, and the fact that no further errors were detected, Kenneth Malek concludes that the KPMG Peat Marwick [sic] is accurate for purposes of using it to calculate the solvency (insolvency) analysis herein."

Malek Report, Exhibit I, page 2.

23. Malek reported that the sources of the insolvency calculations that he made based on KPMG's work were (i) monthly calculations of prepetition amounts owed under investor loan payables, which were calculated by summing all deposits from investors and subtracting all disbursements to such investors; (ii) monthly accumulations of cash balances as reported on prepetition bank statements; and (iii) prepetition commodity investments, which reflected month-end cash-account and open-position balances obtained from Clearing Firm Account Statements.

24. Malek testified that the Business Records and the KPMG Report are the type of information customarily relied upon by experts in the accounting field.

Specifically, Malek stated that it was his opinion that KPMG prepared the KPMG Report in the same method as he would have instructed Navigant employees to utilize.

25. In preparing the Malek Report, Malek consulted with (i) the Trustee; (ii) Phillips; (iii) Valencia Thompson, Malek's assistant; and (iv) Michael Koeningsknecht, one of the attorneys for the Trustee.

26. Malek did not consult with any former employees, directors, or officers of Lake States. Malek spoke with only one investor in Lake States, but only in the context of mediating a dispute unrelated to Malek's investigation and preparation of the Malek Report.

27. Malek does not know who prepared the Business Records upon which he relied to form his opinions.

28. Malek spent 20 to 30 hours reviewing the Business Records and the KPMG Report and preparing the Malek Report. Malek testified that someone at Navigant tested one to 2 percent of the 11,589 transactions reflected in the KPMG Report. Any further testing, according to Malek, would have been cost prohibitive.

29. Malek admitted that he did not provide any analysis relating to either insolvency or a Ponzi scheme for the period of 1984 to 1989 and that his analysis started in 1989.

30. Based on a review of (i) the Business Records that were included in the KPMG Report and (ii) the documents relating to the assets recovered by the Trustee in his "recovery action," Malek determined that the monies coming into Lake States were used to personally enrich Collins and to continue the Ponzi scheme by funding payouts to earlier investors. This conclusion was based in part on Malek's determination from the Clearing Firm Accounts that Lake States procured approximately $117 million from investors, and of that amount, no more than a maximum of $23 million was invested in the accounts. In addition, Malek determined that, exclusive of the new cash invested, Lake States had no other source of income to repay investors. Therefore, Malek concluded that Lake States used new investor funds to pay old investors, which is indicative of a Ponzi scheme operation.

31. Malek determined, based on a review of the Business Records and the KPMG Report, that the sum of Lake State's debts exceeded its assets during the relevant time period. Malek stated that Lake States incurred in the aggregate a net loss of approximately $8 million from its trading activities during this time. Therefore, Malek concluded that Lake States was insolvent from June 1989 through May 1994[2]. Malek opined that he believed it impossible that Lake States was ever solvent at any point in time.

32. The Malek Report was admitted into evidence without an objection. The Defendants, in conceding the admissibility of the Malek Report, restated their hearsay objections with respect to the admission of the KPMG Report and the Net Cash Report.

### (iv) *The Certified Copies of the Indictment and Docket of Criminal Case Against Edward Collins*

33. The Trustee initially offered two other items into evidence: certified copies

---

2. Malek defines insolvency as "the excess of liabilities over the fair value of assets of the debtor, excluding from those assets any that were transferred or concealed with a view to defrauding creditors of consolidated Lake States. And by "consolidated Lake States", I mean the substantively consolidated bankruptcy estates of Thomas Collins, the individual debtor, and Lake States Commodities, the corporate debtor." Transcript of Proceedings, p. 46.

of a criminal indictment issued against Edward Collins (the "Indictment") and the criminal case docket maintained by the Clerk of the United States District Court for the Northern District of Illinois for the case of *United States of America v. Edward Collins,* case no. 99 CR 311, which indicated the entry of judgment against Edward Collins (the "Criminal Docket").

34. The Indictment contains numerous mail fraud and money laundering charges against Edward Collins arising from the operation of Lake States. In Count I of the Indictment, the operation of Lake States is discussed in detail.

35. The Defendants questioned the relevance of the Indictment and the Criminal Docket in the Remaining Adversary Proceedings. The Defendants also noted that they were disadvantaged because they did not have an opportunity to review the Indictment and Criminal Docket, as the Trustee gave no previous indication that he was going to seek their introduction.[3]

36. The Trustee's counsel indicated that he was seeking the introduction of these documents to prove that the Trustee was unable to call Edward Collins to lay a foundation for or authenticate the KPMG Report and Net Cash Report. Presumably, the Trustee is arguing that because Edward Collins could not testify, the Trustee could not lay the foundation for the KPMG Report sand Net Cash Report through normal means.

37. At the trial, the Defendants questioned whether the Trustee failed to supplement his discovery responses to include those documents that the federal government used in its prosecution of Edward Collins and that may have been relevant in the Remaining Adversary Proceedings.

The Defendants argue in their Proposed Findings of Fact and Conclusions of Law that after their concerns about the disclosure of the government's documents were addressed, the Trustee dropped his request to admit the Indictment and the Criminal Docket into the record. This characterization of events is consistent with the fact that the Trustee did not include a discussion of the Indictment and Criminal Docket in his post-trial brief and completely ignored them in his closing argument.

38. Consequently, the Indictment and Criminal Docket are not in evidence to establish any facts or to demonstrate the unavailability of Edward Collins to lay a foundation for the KPMG Report and the Net Cash Report.

## C. *Conclusion of the Trial*

39. After Malek's testimony, the Trustee rested his case. Rather than present evidence, the Defendants moved for judgment on partial findings pursuant to Bankruptcy Rule 7052(c) on the issues of the Ponzi scheme and insolvency.

40. The Court directed the parties to prepare proposed findings of fact and conclusions of law on the issues of a Ponzi scheme and insolvency.

41. Defendants John Sellis, John Sellas, William G. Cook, William E. Cook, Michael Cook, Peter Cook, Susan Cook and William Cook Buick Company filed proposed findings of fact and conclusions of law. The Defendants adopted these findings and conclusions as their own.

42. Prime Table did not move for entry of judgment under Bankruptcy Rule

---

**3.** The Clerk's certifications of the Indictment and the Criminal Docket are dated the date of this trial, May 7, 2001. Moreover, by letter dated May 4, 2001, addressed to the Court by the Trustee with carbon copies to counsel for the Defendants, the Trustee advised that he would only be seeking the introduction of the Malek Report at the trial.

7052(c) nor did it file proposed findings of fact and conclusions of law.

## II.

## CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

43. This Court has jurisdiction pursuant to 28 U.S.C. § 157(a), 28 U.S.C. § 1334(b) and Internal Operating Procedure 15 of the District Court for the Northern District of Illinois.

44. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O).

45. Venue lies in this Court pursuant to 28 U.S.C. § 1409.

### B. Proof of Fraudulent Transfer in the Context of a Ponzi Scheme

46. The Trustee brings the Complaints under section 548 of the Code and comparable sections of the UFTA.

47. Section 548 of the Code provides, in relevant part:

(a) (1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily, or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548.

The comparable section of UFTA provides, in part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/4 (West 2001).

48. "In a Ponzi scheme, an enterprise makes payments to investors with monies received from newly attracted investors,

rather than from profits of a legitimate business venture. Generally, investors are promised large returns on their investments, and initial investors are in fact paid sizeable returns. The fact of those payments helps to attract new investors, giving the impression that a legitimate business opportunity exists, even though there is no underlying business venture. All the while, promoters draw off money from the scheme, often to finance lavish lifestyles. Ultimately the scheme collapses, as more and more investors need to be attracted into the scheme so that the growing number of investors on top can get paid." *Lake States Commodities, Inc.,* 253 B.R. 866, 869 n. 2 (Bankr.N.D.Ill.2000) (citations omitted).

49. Once the enterprise is in bankruptcy, funds obtained by investors from the enterprise can be recovered for the estate as fraudulent transfers. *In re Ramirez Rodriguez,* 209 B.R. 424, 431 (Bankr. S.D.Tex.1997) (citations omitted).

50. Section 548(a)(1)(A) requires a showing of fraudulent intent. Some courts have held that where a bankruptcy trustee relies upon Section 548(a)(1)(A) to recover transfers made by a debtor who allegedly operated a Ponzi scheme, courts will infer intent to defraud on the part of the debtor upon proof that the debtor was indeed operating a Ponzi scheme. *Id.* at 433 (citations omitted).

51. Section 548(a)(1)(B) requires a showing of constructive intent, by demonstrating *inter alia* that the debtor was insolvent. The cases generally concur that if a Ponzi scheme is proven, then the debtor is presumed insolvent from the time of its inception. *See id.* at 432 (citations omitted); *In re Randy,* 189 B.R. 425, 441 (Bankr.N.D.Ill.1995).

■ 52. The Trustee bears the burden of proof at trial, *In re FBN Food Service, Inc.,* 175 B.R. 671, 678 (Bankr.N.D.Ill.

1994), by preponderance of the evidence, *In re Quality Health Care,* 215 B.R. 543, 548 (Bankr.N.D.Ind.1997), *appeal denied, Gouveia v. I.R.S.,* 228 B.R. 412 (N.D.Ind. 1998).

■ 53. In order to prove the existence of a Ponzi scheme, the Trustee must establish by a preponderance of the evidence that

(a) deposits were made by investors;

(b) the Ponzi scheme operator conducted no legitimate business as represented to investors;

(c) the purported business of the Ponzi operator produces no profits or earnings, the source of the funds being new investments by subsequent investors; and

(d) payments to new investors were made from the prior investors' funds.

*Ramirez Rodriguez,* 209 B.R. at 431.

54. Because the Trustee's testimony concerning the operations of Lake States, the KPMG Report and the Net Cash Report were excluded, the only remaining evidence that could serve as proof of the Ponzi scheme and therefore support an inference of actual intent and a presumption of insolvency are Malek's testimony and the Malek Report.

■ 55. The Court must therefore assess the evidentiary weight to give the Malek Report and Malek's testimony. In this regard, the Court will first consider the weight to ascribe to the Malek Report and testimony given the lack of any other evidence in the record. The Court will next consider the weight to give the Malek Report and testimony in light of the testing of the information forming the basis of the Malek Report and the validation of the underlying sources for the Malek Report.

### C. *Assessing the Evidentiary Weight of the Malek Report*

#### (i) *Preliminary Considerations Concerning Expert Testimony*

56. F.R.E. 702 provides that if the trier of fact needs the assistance of specialized knowledge, a qualified expert can testify in the form of an opinion or otherwise.

■ 57. First, the Court determines if the proposed expert qualifies as an expert. In the absence of any objection in this regard and in light of Malek's impressive training and experience, Malek qualifies as an expert.

■ 58. Next, the Court examines the expert's opinion and its efficacy in assisting the litigant in meeting the applicable burden of proof. As an initial matter, an expert can rely on inadmissable hearsay evidence such as another expert's report, in arriving at an opinion. *See e.g., Grant v. Chemrex, Inc.,* 1997 WL 223071, at *7–8 (N.D.Ill.) (allowing expert witnesses under F.R.E. 703 to rely on hearsay, including other expert's opinions, to form an opinion). The expert cannot, however, certify the truth of a prior expert's opinion. *Matter of James Wilson Assoc.,* 965 F.2d 160, 173 (7th Cir.1992).

■ 59. Moreover, the inadmissable evidence relied on by the expert is not somehow transmogrified into admissible evidence simply because an expert relies on it. *Id.* ("The fact that inadmissable evidence is the (permissible) premise of the expert's opinions does not make that evidence admissible for other purposes, purposes independent of the opinion.") Rather, the hearsay is admitted solely to explain the basis of the expert's opinion, not as proof of the underlying matter. *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1261–62 (9th Cir.1984); *Enge-*

*bretsen v. Fairchild Aircraft Corporation,* 21 F.3d 721, 728–29 (6th Cir.1994).

■ 60. Though an expert's opinion may be admissible, the admissibility of the expert's opinion does not equate with its utility in satisfying a burden of proof. *Mid–State Fertilizer Co. v. Exchange Nat. Bank of Chicago,* 877 F.2d 1333, 1338 (7th Cir.1989). The fact finder must still consider the credibility of the expert and determine the weight to be accorded to his or her testimony and report. *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 564 (11th Cir.1998) ("As expert evidence, the testimony need only *assist* the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue. As circumstantial evidence, [the expert's] data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury.") (emphasis in original); *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir.1993) ("The fact that [the expert] relied upon the report in performing his calculation of lost profits did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report."); *Ambrosini v. Labarraque,* 101 F.3d 129, 135–36 (D.C.Cir.1996), *cert. dismissed* 520 U.S. 1205, 117 S.Ct. 1572, 137 L.Ed.2d 716 (1997) (stressing that expert testimony is used to assist the trier of fact, "not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial.").

61. In this case, given the lack of any other evidence in the record, the Court must consider whether the Malek Report and his testimony standing alone, carries enough weight to satisfy the Trustee's burden of proof.

**(ii)** ***The Weight to Be Given the Malek Report in Light of the Absence of Other Evidence in the Record***

■ 62. Under F.R.E. 704, the expert's testimony may embrace an ultimate issue to be decided by the trier of fact. It is clear from the rule's wording that the fact-finding remains with the jury or, in a bench trial, the court. That is why it is unusual, at least to this Court, that the only evidence in this case to prove a fact is expert evidence. Usually, the Court has direct testimonial evidence and business records containing a number of complex facts that the Court requires the expert to summarize into a cogent form and offer an opinion as to what the facts indicate. The Court then considers what credence to give to the expert's opinion and makes the finding of fact in light thereof. This is not to say that a case can categorically never be proven solely with expert testimony. For example, see *In re Lollipop, Inc.*, 205 B.R. 682 (Bankr.E.D.N.Y.1997), and *Ramirez Rodriguez*, 209 B.R. 424, where it appears that the only evidence before the courts may have been expert opinion. But, as pointed out by Defendants, the *Lollipop* and *Ramirez Rodriguez* opinions were decided on motions for summary judgment, where the analysis was on whether an issue of material fact existed for trial, and the court's function was not to assess the weight or credibility of the evidence. *Ortiz v. Ciba–Geigy Corp.*, 87 F.R.D. 723 (N.D.Ill.1980). There was also no discussion in these cases about whether expert testimony standing alone can satisfy a burden of proof.

63. When there is a dearth of other fact evidence in the record, some courts give the expert testimony or report little or no evidentiary weight. For example, in the case of *In re CSI Enterprises, Inc.*, 220 B.R. 687 (Bankr.D.Colo.1998), *aff'd*, 203 F.3d 834, 2000 WL 93989 (10th Cir.2000), the court found that the chapter 11 trustee failed to satisfy the burden of showing that the debtor was insolvent at the time of the purportedly preferential transfer. The valuation expert in that case prepared a report and advised that to arrive at the conclusions in the report, the expert used a financial statement and other information that he determined to be reliable but that were not in the record. There was no evidence before the court to validate the information contained in the financial statement. As a result, the court disregarded the expert's testimony:

> Again, while it is appropriate for an expert to testify and formulate his opinion based on hearsay evidence, in this case the Court is being asked to accept [the expert's] hearsay testimony and his value judgment as evidence of the ultimate fact and in lieu of any proof of the actual indebtedness owed by [the debtor] to [the creditor]. On the other hand, [the expert] has testified that he relied on [the financial statement] because he believed that it was probably accurate. There is no reason whatsoever for the Court to accept [the expert's] evaluation as to the amount of the debt. Clearly, it is not an opinion formulated by him after an audit or any search for the truth of the actual amount of the indebtedness. An expert's testimony cannot be used to subvert rules of evidence.

*Id.* at 696 *citing Matter of James Wilson Associates*, 965 F.2d at 173; *see also In re MiniScribe Corp.*, 241 B.R. 729, 742–43 (Bankr.D.Colo.1999)(unsubstantiated expert testimony is neither helpful nor persuasive); *Sears Roebuck and Co. v. Savoy Reinsurance Co. Ltd.*, 1991 WL 247583 at *6, 1991 U.S. Dist. LEXIS 16329 at *20 (N.D.Ill.) ("An expert's opinion carries no weight unless the facts he relies on to reach his conclusions are also proven."); *Grant*, 1997 WL 223071, at *8; *Donnelly*

*v. Ford Motor Co.*, 80 F.Supp.2d 45, 51 (E.D.N.Y.1999).

64. If there are no facts in evidence, it is difficult to discern how an expert can assist the trier of fact. There being no other evidence in this record, the Court gives no weight to the Malek Report and therefore cannot accept his conclusion as to insolvency and the existence of a Ponzi scheme.

### (iii) *The Effect of Deficiencies in the Expert Report on its Evidentiary Weight*

65. Putting aside the issue of the weight to ascribe the report in the absence of other evidence, the Malek Report carries no weight due to the lack of meaningful testing of the information upon which it is based and the insufficient validation of the underlying sources. In the *CSI* case, the court noted that the expert did not conduct an audit of the underlying information he relied upon. *CSI Enterprises,* 220 B.R. at 696. The expert did not interview the debtor or its employees who were familiar with the financial statement upon which he based his opinion. These factors, along with the absence of the financial statement in the record, lead the court to give no weight to the expert's opinion. *Id.; see also Saad v. Shimano American Corp.,* 2000 WL 1036253, at *21 (N.D.Ill.)(The expert's testimony was admissible, but the court noted that credibility and evidentiary-weight concerns raised by the expert's failure to test certain aspects of his analysis "is certainly ample fodder for cross examination."); *Noble v. Sheahan,* 116 F.Supp.2d 966 (N.D.Ill.2000)(expert's reliance on another expert's hearsay opinion is a question of weight, not admissibility, and whether the expert's reliance on the first expert's opinion was reasonable is an issue for the trier of fact to be decided at trial).

66. In this matter, Malek, a very well-qualified expert, offered honest and forthright testimony in good faith. In Malek's opinion, the KPMG Report was accurate and was useful in arriving at his opinion. On the other hand, Malek admitted on cross-examination that he did not perform a statistical sampling of the 11,589 transactions reflected in the KPMG Report. Neither did Malek perform a forensic investigation on whether any other bank accounts or assets existed to determine solvency. In his opinion, a statistical sampling and forensic examination would have cost too much to the estate. Moreover, Malek did not interview any former employees of Lake States. Instead, Malek relied on what the Trustee told him and the KPMG Report stated about the extent of the bank accounts and assets. Malek admits that the KPMG Report is not a complete report, but doubted whether any further work on the KPMG Report would affect his opinion that Lake States was operating a Ponzi scheme. All of these shortcomings are exacerbated by the fact that the KPMG Report or the underlying Business Records upon which it relied were not in evidence.

67. Had the parties requested that the Court exercise its gatekeeping function under F.R.E. 104 and 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), it is conceivable that the Malek Report and testimony might have been excluded. *See In re Bonham,* 251 B.R. 113 (Bankr.D.Alaska 2000) (court excluded expert testimony because of the lack of substantial factual foundation for his conclusions.) The parties here, however, consented to the admission of the Malek Report. As a result, the evidentiary weight

to ascribe to the expert opinions (not the admissibility of the opinions) is the issue.

68. Even though it is clear that Malek is a recognized expert in these type of matters, given the inadequate showing of meaningful testing and the insufficient validation of the underlying sources, the Court gives the Malek Report no weight.

## III.

### *ENTRY OF JUDGMENT UNDER BANKRUPTCY RULE 7052(c)*

**A. *The Trustee has not Satisfied his Burden of Proof, Therefore, Defendants are Entitled to Judgment Under Bankruptcy Rule 7052(c)***

69. Bankruptcy Rule 7052 provides, in part, "If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence." "Unlike with a motion for directed verdict, the court makes no special inferences in the plaintiff's favor 'nor concerns itself with whether the plaintiff has made out a prima facie case. Instead, the court is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies'." *In re Kids Creek Partners, L.P.,* 212 B.R. 898, 927 (Bankr.N.D.Ill.1997), *aff'd Herzog v. Leighton Holdings, Ltd.,* 239 B.R. 497 (N.D.Ill.1999) *citing Sanders v. General Services Admin.,* 707 F.2d 969, 971 (7th Cir.1983).

70. As stated above, the Malek Report and Malek's testimony are the only items in evidence upon the conclusion of the Trustee's case-in-chief. The Court has decided to give no weight to the Malek Report or the Malek testimony because of the lack of underlying admissible evidence, the inadequate showing of meaningful testing of the information forming the basis of the Malek Report and the insufficient validation of underlying sources of the Malek Report.

71. As a result, the Trustee has failed to demonstrate that the Debtors operated a Ponzi scheme and were therefore insolvent. Consequently, the Trustee is unable to maintain a claim under Sections 548(a)(1)(A) and (a)(1)(B) of the Code and the comparable sections of UFTA and the Defendants are entitled to judgment under Bankruptcy Rule 7052(c).

72. The Court need not address whether it should draw a negative inference from the absence of the Business Records from the record.

**B. *Entry of Judgment Under Bankruptcy Rule 7052(c) in Favor of Defendant Absent from Trial***

73. Prime Table did not attend the trial nor did it join the Defendants in moving for the entry of judgment under Bankruptcy Rule 7052(c). The question under these circumstances is whether the Court can *sua sponte* enter judgment on partial findings in favor of Prime Table on the same grounds it entered such a judgment in favor of the Defendants who did participate in the trial and moved under Bankruptcy Rule 7052(c).

74. Courts have inherent powers to *sua sponte* enter orders in the interest of promoting judicial efficiency and managing their dockets. *See e.g. Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (inherent power to enter sanctions); *Link v. Wabash Railroad Co.,* 370 U.S. 626, 629–32, 82

S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962) (inherent power to dismiss for want of prosecution); *Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 549 (7th Cir.1999) (inherent power to enter summary judgment under certain circumstances); *In re Anthem Communities/RBG, L.L.C.*, 267 B.R. 867, 876–77 (Bankr.D.Colo.2001) (inherent power to enter judgment on partial findings).

75. Bankruptcy Rule 7052 is based upon former Rule 41(b) of the Federal Rules of Civil Procedure which provided, in part:

> After the plaintiff ... has completed the presentation of his evidence, the defendant ... may move for dismissal ... The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

76. The mention in Rule 41(b) of . the defendant moving to dismiss did not carry over to Bankruptcy Rule 7052. *Anthem Communities*, 267 B.R. at 876. Rule 7052(c) does not mention a requirement for a motion. Moreover, "[t]he fact ... that the federal rules do not specifically authorize or describe a particular judicial procedure does not give rise to prohibition of that procedure by negative implication." *Landau & Cleary, Ltd. v. Hribar Trucking, Inc.*, 867 F.2d 996, 1002 (7th Cir.1989) *citing Link v. Wabash .R.R.*, 370 U.S. 626, 628, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734 (1962).

77. Accordingly, there is no prohibition for the Court to exercise its inherent power and *sua sponte* enter judgment under Bankruptcy Rule 7052(c). Courts, however, are cautioned to exercise their inherent powers with restraint and discretion. *Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132.

78. Here, the Trustee put on and rested his case as to the two issues which were identical to *all* defendants, including Prime Table, in the joint trial. The Trustee responded to the Defendants' arguments for entry of judgment on partial findings. In addition, the Trustee proceeded with the trial, including this adversary proceeding, and did not move to default the absent Prime Table and has not done so to date. Under the circumstances, the Court in the interest of judicial efficiency and in light of there being no express requirement for a motion under Rule 7052(c), will enter judgment on the merits, notwithstanding Prime Table's absence from the trial. *See Silberman v. Wigod*, 1988 WL 105305 (N.D.Ill. Oct.5, 1988) *aff'd Silberman v. Wigod*, 914 F.2d 260, 1990 WL 127568 (7th Cir.1990) (district court entered judgment against defendant who did not appear at trial not on a default basis but upon the uncontested facts and evidence presented by the plaintiff).

## IV.

### *CONCLUSION*

79. For the reasons stated herein, judgment on partial findings in favor of Prime Table will be entered by separate order.

### *ORDER*

For the reasons set forth in its findings of fact and conclusions of law entered on this date, judgment in accordance with Rule 7052(c) of the Federal Rules of Bankruptcy Procedure is entered in favor of the defendant Prime Table Restaurant & Lounge, Inc. on all counts of the complaint.