**In re KZK LIVESTOCK, INC., Debtor.**

**Richard E. Barber, not individually but as trustee for the estate of KZK Livestock, Inc., Plaintiff,**

v.

**Production Credit Services of West Central Illinois, FLCA, and Production Credit Services of West Central Illinois, PCA, Defendants.**

**Bankruptcy No. 91–82986.
Adversary No. 95–8069.**

United States Bankruptcy Court,
C.D. Illinois.

May 31, 2002.

Richard E. Barber, Galesburg, IL, for Plaintiff/Trustee.

Alan L. Fulkerson, Chicago, IL, for Plaintiff.

Robert Lindstrom, Galesburg, IL, for Defendants.

## *OPINION*

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

This matter is before the Court on crossmotions for summary judgment. The

facts giving rise to this adversary proceeding have been set forth in two previous opinions, *In re KZK Livestock, Inc.*, 221 B.R. 471 (Bankr.C.D.Ill.1998) and *In re KZK Livestock, Inc.*, Case No. 91–82986, 2000 WL 33950835 (Adv. No. 95–8069) (J. Altenberger, Unpublished, June 6, 2000). The latter opinion pertains to various pretrial issues raised by the parties in anticipation of trial.

To summarize the facts, KZK Livestock, Inc. (DEBTOR), was incorporated in February of 1991, to conduct a livestock feeding operation to be financed by Purina Mills. Kendall Knowles (KNOWLES), the DEBTOR'S sole shareholder, director, and officer, was operating a check kite involving the DEBTOR'S bank account at First National Bank in Blandinsville (FIRST). Prior to filing for bankruptcy, the DEBTOR repaid a loan KNOWLES had with the Defendants, Production Credit Services of West Central Illinois, FLCA, and Production Credit Services of West Central Illinois, PCA (DEFENDANTS). The Trustee, Richard E. Barber (TRUSTEE) brought this adversary proceeding to recover those payments as fraudulent transfers, both under the Bankruptcy Code and under the Illinois Uniform Fraudulent Transfer Act. As the case has developed, Count II, brought under § 548(a)(2) of the Bankruptcy Code, is the only remaining count.[1]

In order to avoid a transfer under § 548(a)(2), the TRUSTEE must establish that (1) the debtor transferred an interest in property; (2) the transfer of that interest occurred within one year prior to the filing of the bankruptcy petition; (3) the debtor was insolvent on the date of the transfer or became insolvent as a result thereof; and (4) the debtor received less than reasonably equivalent value in exchange for such transfer. *In re GWI PCS 1 Inc.*, 230 F.3d 788 (5th Cir.2000).

By a previous opinion, this Court granted the TRUSTEE'S motion for partial summary judgment on Count II of the complaint, leaving as the only remaining issue under Count II whether the DEBTOR was insolvent at the time the transfers were made. In that same opinion, this Court rejected the DEFENDANTS' contention that the DEBTOR and KNOWLES were one and the same.[2] In so ruling, this Court, characterizing the evidence as sparse, noted that the parties had made it clear that they wanted the Court to decide the case on the record before it. The district court denied the DEFENDANTS' motion for leave to appeal the ruling, and the DEFENDANTS persisted in their demand for a jury trial.

In early 1999, this Court denied the TRUSTEE'S motion to strike the jury demand and directed that a final pretrial be scheduled in the late summer. A final pretrial was held on January 24, 2000, and the case was set for trial the week of March 14, 2001. The parties filed several pretrial motions which were heard on February 23, 2000, and, at that time, the parties agreed to a settlement conference being held before a different bankruptcy judge. This Court issued its ruling upon the pretrial motions in June, 2000. In that opinion dated June 6, 2000, this Court held that the individual assets and liabilities of KNOWLES had no role to play in determining the DEBTOR'S solvency or insolvency. As this Court stated, "Prior rul-

---

**1.** All other counts and affirmative defenses have been eliminated.

**2.** Applying the theory of reverse piercing of the corporate veil, the DEFENDANTS argued

that their loan to KNOWLES was value to the DEBTOR, given that KNOWLES was the alter ego of the DEBTOR.

ings of this Court in this proceeding have made it abundantly clear that KNOWLES and the DEBTOR were separate legal entities and that the DEFENDANTS' 'alter ego' defense has been rejected." The settlement conference, held in late June before a different bankruptcy judge, failed to result in a settlement. Both the TRUSTEE and the DEFENDANTS filed motions for summary judgment that are now before this Court.

■ As previously noted, the only issue is whether the DEBTOR was insolvent on July 18, 1991, and on July 22, 1991, when it transferred payments totaling $90,813.08, to the DEFENDANTS. Section 101(32) of the Bankruptcy Code employs a "balance sheet" test for insolvency, defined as a financial condition such that "the sum of [the] entity's debts is greater than all of [the] entity's property, at a fair valuation," exclusive of exempt and fraudulently transferred assets. 11 U.S.C. § 101(32)(A). The proper inquiry is what price a willing buyer would offer for the debtor's entire package of assets and liabilities, and if that inquiry results in a positive figure, the debtor is solvent. *Covey v. Commercial Nat. Bank of Peoria,* 960 F.2d 657 (7th Cir.1992).

■ Proof of insolvency "contemplates a showing of the fair value of all the debtor's property, compiled by the use of balance sheets, financial statements, appraisals, expert testimony, and other affirmative evidence and compared to the amount of his debts." *In re R. Purbeck & Associates, Ltd.,* 27 B.R. 953, 955 (Bankr.D.Conn. 1983), quoting *In re Phippens,* 4 B.R. 155, 159 (Bankr.M.D.Tenn.1980). Such a determination will ordinarily begin with audited financial statements, prepared in conformity with generally accepted accounting principles (GAAP)[3] and extend to an examination of the financial records of the debtor, including bank account statements, journals, ledgers, tax returns, and all contracts, notes and security agreements. Where the books and records are not complete, the trustee must reconstruct the debtor's financial condition, from whatever sources are available.

Proof of insolvency is almost always difficult, even in the best of cases where the debtor's financial records are complete. *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573 (1st Cir.1980). The task is rendered formidable when the debtor has failed to keep a proper set of books in the operation of its business. Recognizing this difficulty, courts permit the trustee to show that the debtor was insolvent at one point in time and then prove that the same condition existed at the time of the subject matter transfer. *Id.* This method of proof has been given the label of "retrojection." As summarized by one bankruptcy court:

> [A] trustee may meet his burden of proof by showing that the debtor was insolvent at a reasonable time subsequent to the date of the alleged transfer, accompanied by proof that no substantial change in the debtor's financial condition occurred during the interval.

*In re Kaylor Equipment & Rental, Inc.,* 56 B.R. 58 (Bankr.E.D.Tenn.1985).

■ The burden is on the TRUSTEE to prove insolvency by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Kaypro,* 218 F.3d 1070 (9th Cir. 2000). The TRUSTEE must establish that the DEBTOR was more likely insolvent than not at the time of the transfers.

**3.** Although GAAP are relevant in making solvency determinations, they are not controlling and no GAAP exist for analyzing the insolvency of a company. *In re Kaypro,* 218 F.3d 1070 (9th Cir.2000).

The determination of insolvency generally presents complex factual determinations that seldom lend themselves to disposition by summary judgment. As noted before, however, both parties have moved for summary judgment, agreeing that there are no disputed issues of fact, and that nothing would be added to the record through a trial.

In support of his motion, the TRUSTEE submitted affidavits from Neil M. Gerber and John R. Baber.[4] Baber is a retired Special Agent for the Federal Bureau of Investigation (FBI) who concentrated in the area of financial crime, including check kiting, while at the FBI. He was retained by the TRUSTEE to prepare kite schedules for each account where kiting activity occurred, including the DEBTOR'S account. Baber's analysis of this activity examined the flow of uncollected funds between various accounts in order to calculate the kite balance so that the nature and extent of the DEBTOR'S indebtedness to FIRST could be calculated daily. His analysis, in contrast to that of Gerber, is based entirely on bank account records and is not subject to the DEFENDANTS' attack.

Gerber, an Illinois licensed Certified Public Accountant, a Certified Business Appraiser, and a Certified Valuation Analyst, was hired by the TRUSTEE to prepare an insolvency analysis. Gerber is an experienced CPA, specializing in providing business valuation services. Since 1984, he has been a shareholder in the public accounting firm of Heinold–Barnwart, Ltd. According to his affidavit, a substantial portion of his practice is devoted to audit and valuation work for many different types of industries, including grain elevators and livestock farm operations. In reaching his opinion, Gerber relied upon KNOWLES' depositions; hog commodity prices obtained from the United States Department of Agriculture for 1991; commodity statements for the DEBTOR'S various accounts; monthly hog inventory reports completed by KNOWLES or Purina Mills during 1991[5]; a statement of account balances due Purina Mills from DEBTOR for 1991, pursuant to DEBTOR'S line of credit; check kite schedules prepared by Baber; the promissory note and guarantees of indebtedness of LaMoine Valley Pork; the judgment order dated December 23, 1991, which Central Soya obtained against LaMoine Valley Pork in the amount of $214,835; and telephone conversations with various individuals at Purina Mills and TAC Commodities.[6]

According to Gerber's analysis, the DEBTOR was occasionally insolvent from February 6, 1991 until June 4, 1991. Then, beginning on June 11, 1991, the DEBTOR was again insolvent and never became solvent again. Specifically, Gerber's analysis shows the following for the dates of the transfers:

**4.** The TRUSTEE also relies upon the deposition of Gary Akers, one of the DEFENDANTS' employees.

**5.** In his deposition, Gerber testified that he contacted the Purina Mills representative to determine the reliability and completeness of the inventory reports that he had been provided and to obtain information concerning their valuation.

**6.** In his deposition, Gerber states that he telephoned TAC Commodities in order to determine that he had all of the available information concerning the commodity accounts.

| DATE | KITE BALANCE | ACCOUNTS PAYABLE | NOTE TO CENTRAL SOYA | COMMODITY ACCOUNT | HOG INVENTORY | NET ASSETS |
|------|------|------|------|------|------|------|
| | KZK Only / Combined[7] | Purina[8] | | | | KZK only / Combined |
| 7/18 | (178,328) / (411,141) | (300,206) | -------- | -------- | 328,464 | (150,070) / (382,883) |
| 7/22 | (243,729) / (476,642) | (300,206) | ------- | ------- | 328,464 | (215,471) / (448,384) |

■ The TRUSTEE contends that Gerber's affidavit is sufficient to sustain his burden to establish insolvency. If admissible, expert opinion evidence in affidavit form may properly be considered on a motion for summary judgment. Fed. R.Civ.P. 56(e); *Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301 (10th Cir. 2000). To meet the standards for admissibility, expert testimony must be based on reliable knowledge and methodology. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Navarro v. Fuji Heavy Industries, Ltd.*, 117 F.3d 1027, 1032 (7th Cir.1997).

■ The DEFENDANTS challenge Gerber's affidavit under *Daubert*, characterizing his insolvency analysis as speculative and unreliable, faulting both its form and its content. Specifically, the DEFENDANTS assert that Gerber's report does not describe the principles and methods relied upon in conducting the valuations nor the professional organizations which may establish standards for that methodology.

According to his affidavit, the information Gerber relied upon is of the type reasonably relied upon by accountants and auditors in forming an opinion regarding a company's financial condition. Further, this Court, in denying the DEFENDANTS' pretrial motion to exclude Gerber's testimony, ruled that the perceived shortcomings in the experience and methodology of the TRUSTEE'S two expert witnesses did not render them unqualified to testify, but may affect the weight to be given their testimony. In so ruling, the Court anticipated that the experts would testify at trial and that their reports would be both developed by their testimony and tested by cross-examination. Notwithstanding the absence of that testimony, however, this Court will abide by its ruling that the requirements of *Daubert* have been satisfied and the weight to be given their affidavits and reports are matters for the Court to now decide.

The DEFENDANTS discredit Gerber's analysis, contending that it bears no resemblance to a real balance sheet. The DEFENDANTS also contend that Gerber did not perform an adequate investigation, pointing to his failure to meet with the TRUSTEE, KNOWLES, or any of the DEBTOR'S employees, or to examine certain corporate documents including daily journals, review accounts receivable or payable, review payroll, examine bank statements and cancelled checks, and other corporate documents. The DEFENDANTS regard Gerber's opinion as the product of "voodoo" economics. The DEFENDANTS further criticize Gerber's failure to analyze transfers between the DEBTOR and KNOWLES, given the TRUSTEE'S awareness that feed bills were being sent to KNOWLES personally, rather than to the DEBTOR.

In this Court's view, the main problem in this case is not the form which Gerber's analysis takes, nor the methodology or val-

---

**7.** The column in the kite balance shown as "combined" represents four different bank accounts: the DEBTOR'S account at First National Bank of Blandinsville, KNOWLES' Farm Account at the Colchester State Bank, the LaMoine Valley Pork account with the Citizens National Bank and the LaMoine Valley Pork account with the Union National Bank.

**8.** Balances shown represent the account payable to Purina.

uation techniques he employs, but the competency of the foundation of his analysis. Gerber admits in his affidavit that he did not consider any of the DEBTOR'S financial records including accounts receivable, accounts payable, and tax returns, payroll records or general corporate documents relating to the DEBTOR'S corporate structuring.[9] The reason for his omission is no mystery—those records did not exist. The DEBTOR'S books and records were scant and KNOWLES' financial misdoings further complicated the matter.

In preparing his insolvency analysis, Gerber relied solely upon the hog inventory records that were originally prepared by KNOWLES and provided to Purina. Gerber, faced with little choice, assumed that the information contained therein was accurate. Because KNOWLES only took an inventory once a month, Gerber attempted to reconstruct the inventory on a day-to-day basis, assuming that the Purina transactions directly impacted the hog inventory, increasing and decreasing the number of hogs based upon the cash transactions made on the Purina account. From the information provided by KNOWLES as to the quantities of hogs on hand, Gerber applied the two valuation methods obtained from Purina in order to determine the market value. Gerber acknowledged that KNOWLES stated that he never actually went out and counted the

hogs and that on various occasions the hogs were commingled. Notwithstanding those rudimentary deficiencies, Gerber concluded that the values he placed on the hog inventory were likely overstated and that the liabilities were likely understated.

In short, Gerber's insolvency analysis fails to meet the standards demanded by the Bankruptcy Code. His attempt to re-create the DEBTOR'S business operations is just too speculative, given the lack of reliable records and KNOWLES' commingling of assets. No attempt was made to reconcile the transfers between KNOWLES personally, the DEBTOR, and his other entities. Unfortunately, the TRUSTEE'S already substantial burden was in no way eased by an evasive and largely unhelpful KNOWLES who was obviously preoccupied with the criminal proceeding against him.

As Bankruptcy Judge Susan Sonderby recently noted in *In re Lake States Commodities, Inc.*, 271 B.R. 575 (Bankr. N.D.Ill.2002), just because an expert's opinion is admissible does not necessarily mean that it will satisfy the trustee's burden of proof on the issue of insolvency. This may be especially true where the expert's opinion stands alone. In *Lake States*, the only evidence before the court to prove any facts was expert evidence. Missing from the record were direct testimony and business records which, ordi-

---

9. Among the things Gerber states in his affidavit that he did not consider were any of the DEBTOR'S financial records including accounts receivable, accounts payable, and tax returns; status of possible leases; payroll records; or general corporate documents relating to the corporate structuring of the DEBTOR. Gerber explained the omission of some of the documents specifically the DEBTOR'S financial records-as unnecessary in conducting a solvency analysis in contrast with an audit. This Court recognizes the difference between the objectives of the two analyses. A solvency analysis simply tries to determine at

what point if ever a company's liabilities exceeded its assets while an audit is more concerned with how records were kept and how the manner of keeping these records affects their accuracy. Failure to consider these financial records is no reflection upon Gerber's professional skills. He used all the available information he had. It is not Gerber's failure to incorporate any of these financial records in his insolvency analysis that concerns the Court, it is the complete lack of such records as a result of KNOWLES' poor record keeping.

narily, would be reviewed and abstracted by the expert, and upon which the expert would render his opinion.[10] Addressing the weight to be given the expert's report considering the absence of other evidence, Judge Sonderby stated:

> When there is a dearth of other fact evidence in the record, some courts give the expert testimony or report little or no evidentiary weight. For example, in the case of *In re CSI Enterprises, Inc.*, 220 B.R. 687 (Bankr.D.Colo.1998), *aff'd*, 203 F.3d 834, 2000 WL 93989 (10th Cir. 2000), the court found that the chapter 11 trustee failed to satisfy the burden of showing that the debtor was insolvent at the time of the purportedly preferential transfer. The valuation expert in that case prepared a report and advised that to arrive at the conclusions in the report, the expert used a financial statement and other information that he determined to be reliable but that were not in the record. There was no evidence before the court to validate the information contained in the financial statement. As a result, the court disregarded the expert's testimony:

>> Again, while it is appropriate for an expert to testify and formulate his opinion based on hearsay evidence, in this case the Court is being asked to accept [the expert's] hearsay testimony and his value judgment as evidence of the ultimate fact and in lieu of any proof of the actual indebtedness owed by [the debtor] to [the creditor]. On the other hand, [the expert] has testified that he relied on [the financial statement] because he believed that it was probably accurate. There is no reason whatsoever for the Court to accept [the expert's] evaluation as to the amount of the debt. Clearly, it is not an opinion formulated by him after an audit or any search for the truth of the actual amount of the indebtedness. An expert's testimony cannot be used to subvert rules of evidence.

> *Id.* at 696 *citing Matter of James Wilson Associates*, 965 F.2d [160] at 173 [(7th Cir.1992)]; *see also In re MiniScribe Corp.*, 241 B.R. 729, 742–43 (Bankr.D.Colo.1999)(unsubstantiated expert testimony is neither helpful nor persuasive); *Sears, Roebuck and Co. v. Savoy Reinsurance Co. Ltd.*, 1991 WL 247583 at *6, 1991 U.S. Dist. LEXIS 16329 at *20 (N.D.Ill.)("An expert's opinion carries no weight unless the facts he relies on to reach his conclusions are also proven."); *Grant [v. Chemrex, Inc.]*, 1997 WL 223071, at *8; *Donnelly v. Ford Motor Co.*, 80 F.Supp.2d 45, 51 (E.D.N.Y.1999).

> If there are no facts in evidence, it is difficult to discern how an expert can assist the trier of fact. There being no other evidence in this record, the Court gives no weight to the [expert's] Report and therefore cannot accept his conclusion as to insolvency and the existence of a Ponzi scheme.

271 B.R. at 586–87.

Turning to the evidentiary weight to be given the expert's report in light of its deficiencies, Judge Sonderby stated:

> [The expert's report] carries no weight due to the lack of meaningful testing of the information upon which it is based and the insufficient validation of

---

**10.** The court pointed out that an expert's opinion alone may carry the day on a motion for summary judgment when the issue is whether an issue of material fact exists for trial. The case before the Court does not fit that category because, as previously noted, the issue is a factual one, and, as this case is more than a decade old, the parties want to lay the matter to rest.

the underlying sources. In the *CSI* case, the court noted that the expert did not conduct an audit of the underlying information he relied upon. The expert did not interview the debtor or its employees who were familiar with the financial statement upon which he based his opinion. These factors, along with the absence of the financial statement in the record, lead the court to give no weight to the expert's opinion.

In this matter, [the expert witness], a very well-qualified expert, offered honest and forthright testimony in good faith. In [his] opinion, the [accountant's] Report was accurate and was useful in arriving at his opinion. On the other hand, [the expert witness] admitted on cross-examination that he did not perform a statistical sampling of the 11,589 transactions reflected in the [accountant's] Report. Neither did [the expert witness] perform a forensic investigation on whether any other bank accounts or assets existed to determine solvency. In his opinion, a statistical sampling and forensic examination would have cost too much to the estate. Moreover, [the expert witness] did not interview any former employees of [the debtor.] Instead, [he] relied on what the Trustee told him and the [accountant's] Report stated about the extent of the bank accounts and assets. [The expert] admits that the [accountant's] Report is not a complete report, but doubted whether any further work on the [accountant's] Report would affect his opinion that [the debtor] was operating a Ponzi scheme. All of these shortcomings are exacerbated by the fact that the [accountant's] Report or the underlying Business Records upon which it relied were not in evidence. (Citations omitted).

Many of the flaws inherent in the expert's testimony in *Lake States* are pres-

ent here. Neither KNOWLES' inventory counts nor the inventory reports completed by Purina Mills are part of the record. In his opinion letter, Gerber acknowledges that the DEBTOR commingled hog inventories and that the inventory counts during certain periods were not accurate. All of his information regarding the DEBTOR'S assets and liabilities was gleaned from the TRUSTEE'S attorneys. He did not review any of the DEBTOR'S business records or talk to any of the DEBTOR'S officers or employees. In light of those shortcomings, Gerber's report is lacking in foundation and this Court gives it little weight.

In summary, proof of insolvency is a traditionally difficult burden. A financial statement presents only a "snapshot" of the debtor's financial circumstances as of that particular date. Where the financial statement is itself accurate and the debtor has maintained proper books and records, the trustee is able to work forward or backward, reconstructing the debtor's assets and liabilities as of the date of the transfers, with a proper degree of precision. However, when, as here, the debtor's financial records are meager and less than trustworthy, attempts at reconstruction are suspect and the "snapshot" displayed may not reflect the debtor's true condition and the effect of initial errors in the "snapshot" may easily be magnified when attempting to "retroject" the "snapshot." It is in this context that Gerber's determination that the DEBTOR, during the four-month period beginning in early February, 1991, and ending in early June, 1991, was in and out of solvency, becoming insolvent "for good," on June 11, 1991, the month before the two transfers at issue took place, must be assessed. Given the uncertainties upon which Gerber's analysis was based, can it be said, as more probably true than not, that the DEBTOR, on

the brink of insolvency in the month preceding the transfers to the DEFENDANTS, and in fact crossing back and forth between solvency and insolvency, was unquestionably insolvent just that short period of time later? This Court is simply not convinced.

Contrary to the DEFENDANTS' aspersions, however, the TRUSTEE cannot be faulted in this case. The TRUSTEE appears to have done the best he could with what he had. In the end, he was simply unable to overcome the unreliability inherent in the DEBTOR'S poor record-keeping, making the requisite degree of exactitude impossible to achieve. As the ultimate finder of fact, this Court cannot hold that TRUSTEE met his burden of proof on the issue of the DEBTOR'S insolvency at the time the transfers were made to the DEFENDANTS.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.