**In re GUNNISON CENTER APARTMENTS, LP, Debtor.**

**No. 04–33079 MER.**

United States Bankruptcy Court, D. Colorado.

Feb. 8, 2005.

Gary R. Appel, Appel & Lucas, P.C., Denver, CO, for Debtor Gunnison Center Apartments, LP.

Douglas W. Jessop, Kerstin E. Cass, Jessop & Company, P.C., Denver, CO, for Movant Lenox Mortgage V Limited Partnership.

## ORDER GRANTING RELIEF FROM AUTOMATIC STAY

MICHAEL E. ROMERO, Bankruptcy Judge.

THIS MATTER comes before the Court on the Motion of Lenox Mortgage V Limited Partnership for Relief from Stay and the Debtor's Response thereto. The Court has heard the arguments of counsel, reviewed the pleadings and received evidence in open court and, for the reasons set forth below, grants the requested relief.

## I. JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 28 U.S.C. § 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G), as it involves administration of the bankruptcy estate and involves a motion to terminate, annul, or modify the automatic stay.

## II. BACKGROUND FACTS

On October 21, 2004, Gunnison Center Apartments, Inc. (the "Debtor"), filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code. The Debtor is a limited partnership comprised of several former mechanic's lienholders, which was formed in order to foreclose on an 87–unit, five-building apartment complex located in Gunnison, Colorado (the "Property") after the developer failed to pay for material and service costs. The general partner of the Debtor is PTF Holdings, an entity owned 100% by Mr. Derek Anderson. R Homes, one of the original mechanic's lienholders and another entity controlled by Mr. Anderson through his wholly owned company, Plantagenet Funding, is a 50% limited partner of the Debtor. The remaining limited partner interests are held by the other mechanic's lienholders.

This bankruptcy is the Debtor's second Chapter 11 filing in the past thirteen months. The Debtor's previous case was filed in October of 2003 and was voluntarily dismissed on April 27, 2004. Both bankruptcies were precipitated by the Debtor's continued inability to service the secured debt on the Property.

The Property is subject to a Deed of Trust Note, Security Agreement and Deed of Trust (collectively the "Note") currently held by Lenox Mortgage V Limited Partnership ("Lenox").[1] At the time the Debtor's predecessor-in-interest executed the Note on November 12, 1997, it agreed to make interest-only payments for the first fourteen months and thereafter to make monthly principal and interest payments in the amount of $32,719.40 over the next forty years. The Debtor acquired its ownership interest in the Property in 2001, subject to the Note. The Debtor has not made any payments to the holder of the Note since August 26, 2003, and is currently in default.

Shortly after Lenox acquired the Note, it filed an *ex parte* motion in the Gunnison County District Court (the "State Court") requesting the appointment of a receiver for the Property, based in part on the Debtor's failure to make its monthly payments. The State Court granted this request on October 8, 2004. Approximately

---

1. Lenox acquired its interest from the United States Department of Housing and Urban Development ("HUD"). Zions First National Bank was the original holder of the Note which was guaranteed by HUD. When the Debtor defaulted on the loan, HUD paid Zions per the terms of its guaranty and the Note was subsequently assigned to HUD.

one week later, the Debtor moved to have the receiver motion reconsidered. On October 21, 2004, the State Court set a November hearing on the Debtor's request and substituted a local real estate professional as the receiver, pending that hearing. Later that same day the Debtor filed the within Chapter 11 case. Lenox's request to lift the automatic stay in order to foreclose on the Property followed.[2]

## III. DISCUSSION

Section 362(d) sets forth the grounds for relief from the stay:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

■ Upon filing a relief from stay motion, the initial burden of going forward to show the grounds that compel the lifting of the stay rests with the creditor. *See In re*

*Anthem Communities*, 267 B.R. 867, 870–871 (Bankr.D.Colo.2001). Once grounds have been established, the moving party need only prove the issue of lack of equity in the property. The burden of proof rests with the debtor as to all other issues. 11 U.S.C. § 362(g).

Lenox bases its request for relief under both 11 U.S.C. §§ 362(d)(1) and (d)(2). The Court will address each of Lenox's arguments in turn.

### A. For Cause— § 362(d)(1)

#### 1. Lack of Adequate Protection.

Lenox argues it is not adequately protected because the Property is declining in value and the Debtor has failed to make any recent payments on the Note. The Property is allegedly in need of significant repairs which will cost in excess of $500,000. Lenox directs the Court's attention to a Fannie Mae Physical Needs Assessment Report, dated August 25, 2004 (the "Assessment Report") (**Exhibit S**) and a subsequently conducted property evaluation dated December 28, 2004, (the "Evaluation Letter") (**Exhibit II**), both prepared by Mr. Glen Adams. Both the Assessment Report and the Evaluation Letter identify substantial existing or potential unsafe conditions that need immediate repair.[3] Lenox argues the Debtor's

2. In addition to its motion for relief from stay, Lenox filed an Emergency Motion for an Order (I) Prohibiting Use of Cash Collateral, (II) Requiring Debtor to Segregate and Account for Cash Collateral, (III) in the Alternative, Granting Adequate Protection and (IV) Sanctioning Debtor and its Management. Lenox alleges the Debtor is using its cash collateral without this Court's permission or Lenox's consent. Specifically, Lenox argues the Debtor is using rents, issues, profits, and income from the Property to make capital improvements, for the operation and maintenance of the Property and for administrative expenses in the bankruptcy case. The parties agreed to

have the Court hear this matter after it renders its ruling on the relief from stay motion.

3. There is some difference of opinion as to the scope and cost of the necessary repairs to the Property. On this issue, the Court finds the testimony of Mr. Glen Adams to be the most credible. Mr. Adams is an independent third party sent by HUD to assess the condition of the Property. The documents he generated identified and categorized the repair needs and costs, using his own experience and expense numbers provided by the property manager for the Property. According to his report, the Property has immediate physical

failure to remedy the unsafe conditions continues to adversely affect the value of the Property and leaves Lenox's secured position inadequately protected. In contrast, the Debtor argues the value of the Property has increased since the filing of the bankruptcy case and continues to increase as a result of its hiring of a "new" property manager and its continued efforts to refurbish and renovate several of the apartments, stagger the lease agreements with tenants and repair the defective stairwells in each building.

■ The purpose of providing adequate protection is to insure that a creditor receives the value for which it bargained pre-bankruptcy. *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987). Adequate protection is, essentially, protection for the creditor to assure its collateral is not depreciating or diminishing in value[4] and is made on a case-by-case basis. *Id.* at 1397. The secured creditor "must, therefore, prove this decline in value-or the threat of a decline-in order to establish a *prima facie* case." *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr.S.D.N.Y.1994).

■ In this case, Lenox has not established the Property has declined in value since the petition date. In fact, the evidence supports the contrary. There is no question the Property requires critical maintenance if it is to remain viable, including the correction of the seriously defective stairwells. However, this problem existed prior to the bankruptcy filing, and the evidence presented to the Court indicated that repair work is underway to remedy this situation. There may be issues related to the future funding and timing of such repairs; but at this time it appears that Lenox's interests are adequately protected, with the possible exception of its cash collateral, which is addressed below.

## 2. Improper Use of Cash Collateral.

Lenox has asserted the Debtor's improper use of cash collateral is a basis for the granting of its requested relief as part of both its adequate protection and bad faith arguments. In evaluating issues surrounding cash collateral, the Tenth Circuit has noted:

> The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard ... In doing so, however, care must be exercised to insure that the vested property rights of the secured creditor and the values and risks bargained for by that creditor prior to the bankruptcy are not detrimentally affected.

*In re O'Connor*, 808 F.2d at 1398, *citing In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985).

The evidence presented to the Court through witnesses and the admitted exhibits establishes the following:

1. The Deed of Trust and the Security Agreement provide that Lenox is the assignee of rents, issues, profits and income for the Property (the "Rents"). **Exhibits B and C.**

---

needs which will require an outlay of approximately $540,600 in the short term to correct.

4. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988).

2. On October 6, 2004, prior to the Debtor's bankruptcy filing, Lenox filed an Emergency Motion for *Ex Parte* Appointment of Receiver for the Property (the "Receiver Motion"), in the State Court. On October 8, 2004, the State Court entered the *Ex Parte* Order Appointing Receiver (the "Receiver Order"), **Exhibits V and W.**

3. On October 21, 2004, the State Court issued an order substituting a new receiver for the Property. **Exhibit Z.**

4. On October 25, 2004, Lenox filed its (1) Notice of Assignment of Rents and Income and Demand for Segregation Thereof; (2) Notice of Claim of Interest in Rents and Proceeds Pursuant to 11 U.S.C. § 546(b); and (3) Demand for Segregation and Accounting of Cash Collateral Under 11 U.S.C. § 363(c) (the "546(b) Notice"). In the 546(b) Notice, Lenox perfected its interest in the Rents pursuant to 11 U.S.C. § 546(b) and stated that it would *not* consent to the use of Rents.

Thus, Lenox perfected its security interest in the Rents in two ways. Initially, its interest in the Rents was perfected when a receiver was appointed by the State Court on October 8, 2004. *See In re Jefferson Bus. Center Assoc.*, 135 B.R. 676, 681 (Bankr.D.Colo.1992) (the applicable law in Colorado provides for prepetition perfection by the assignee of an interest in rents upon the assignee's request for and the resulting appointment of a receiver). Sec-

ondly, in an overabundance of caution, Lenox further perfected its security interest in the Rents when it filed its 546(b) Notice. *See Consolidated Capital Income Trust v. Colter, Inc.*, 47 B.R. 1008, 1011 (Bankr.D.Colo.1985) (Interest of a secured creditor in rents can be perfected by filing a notice under § 546(b) of the Bankruptcy Code.)

■ Section 363(a) of the Bankruptcy Code includes rents or profits from property in its definition of cash collateral.[5] That section provides that the Debtor cannot use cash collateral unless the entity who has an interest in the collateral consents; or the Court, after notice and hearing, authorizes such use. 11 U.S.C. § 363(c)(2). In this case, the Debtor argues that by reason of the language contained in the case of *In re Morning Star Ranch*, 64 B.R. 818 (Bankr.D.Colo.1986), monies spent for the operation, maintenance, preservation and protection of the Property are not cash collateral and thus, no consent or court authorization is necessary to use those funds. This Court disagrees.

In *Morning Star*, a creditor claiming a secured interest in rents generated in the debtor's hotel operation, sued for a temporary restraining order ("TRO") prohibiting the debtor's use of those monies. Judge Charles E. Matheson held the TRO complaint was the equivalent of a motion under § 363 to prohibit the use of cash collateral. After discussing the various methods an inchoate lien in rents could be perfected, Judge Matheson then held:

5. Section 363(a) states:
 In this section, cash collateral means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of

property and the fees, charges, accounts or other payment for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided for in section 552(b) of this title, where existing before or after the commencement of a case under this title.

When bankruptcy intervenes the property of the debtor becomes subject to the jurisdiction of this Court and the rights of the lender are at least suspended by reason of the automatic stay under 11 U.S.C. § 362. The stay deprives the lender of the right to have a receiver appointed and, but for the operation of 11 U.S.C. § 546(b), would deprive the lender of the opportunity to perfect his inchoate interest in the rents and profits of the real property. The *Colter* decision recognizes that a notice filed under 11 U.S.C. § 546(b) serves the same purpose as the appointment of a state court receiver absent the advent of bankruptcy. *Colter* does not serve to improve the lender's position. Thus, upon the filing of the § 546(b) notice, the lender does not become entitled to claim a right to all of the rents collected by the debtor. The lender, instead, is at best entitled to the protection to which he would have been entitled had a receiver been appointed.

It is clear in this case that there would be no proceeds to fight over if the property is not operated. If a receiver were to operate the Debtor's property, he would be required to pay the operating expenses. Indeed, that is precisely what the deed of trust in this case requires. He would also be required to pay for the preservation of the property and that also is what is specified by the deed of trust. Costs of management and preservation would normally include costs for utilities, telephone service, laundry service, maid service, cleaning service, groundskeeping, supplies and the costs of employees to cover such things as reservations, check-in, cashiers, accounting, etc. Further, under normal receiverships, the receiver would be paid a receiver's fee. He might, as well, hire a managing company to manage the property and pay a management fee. He might also engage accountants or attorneys in appropriate circumstances and pay their fees and expenses. All of those costs would come out of the rents received before any monies would be paid over to the lender.

*Morning Star*, 64 B.R. at 822. Judge Matheson concluded that, although the secured creditor had perfected its interest, the debtor was entitled to use, with supervision, certain of the income generated by the property to pay the same expenses as would a receiver, if one were in place. *Id.* at 823.

It is critical to note that *Morning Star* does not carve out an exception to the requirements of § 363(a) prior to the use of any cash collateral. Rather, it only outlines possible arguments which could be made on the cash collateral issue without ruling on the same. As stated by the Court:

> One might argue that there is no "cash collateral" until all of the expenses are accounted for and that only what is left is cash collateral in which the lender has an interest. Conversely the lender can argue that he has an interest in all of the cash, subject only to the payment of reasonable operating and preservation expenses which must be strictly accounted for. Whichever approach is used, the ultimate result is the same. The filing of the notice under 11 U.S.C. § 546(b) served, in this case, to protect the Plaintiff's inchoate interest in the rents and profits derived by the Debtor's operation of its resort.

*Id.* at 822–23.

It is a basic rule of statutory construction that a statute must be interpreted to mean what it says. *DeMassa v. MacIntyre (In re MacIntyre)*, 74 F.3d 186, 188 (9th Cir.1996). Pursuant to § 363, a "trus-

tee,[6] after notice and hearing, may use, sell, or lease [cash collateral] other than in the ordinary course of business, property of the estate." The Bankruptcy Code is clear and unambiguous. If there is no agreement in place with the secured creditor, the debtor's right to use cash collateral must be "after notice and a hearing." In this case, the Debtor failed to obtain either Lenox's consent to the use of its cash collateral or the Court's permission to do the same. This failure or refusal to obtain consent or permission is a clear violation of the dictates of § 363(b).

■ However, the technical violation of § 363 in this case does not provide sufficient grounds to support a finding that the secured interest of Lenox is not adequately protected. Had Lenox moved the Court to prohibit use of cash collateral on the first day of the Debtor's case, in all likelihood the Debtor would have been given authorization to use the cash collateral consistent with the parameters and restrictions set forth in *Morning Star.*[7] Use of funds for those reasons ultimately benefits Lenox. While the Debtor has admitted using some of the cash collateral in a fashion inconsistent with the *Morning Star* restrictions, it was represented to the

Court that the insiders to the operation would reimburse to the estate any amount determined to have been improperly used. Assuming the Debtor does indeed return any funds as directed by this Court, Lenox's secured interest in cash collateral will not have been diminished.[8]

### 3. Bad Faith.

■ Lenox also argues the Debtor has filed this case in bad faith.[9] While the Debtor admits that it has made some mistakes during the course of this bankruptcy case, it argues the mistakes, errors and omissions were unintentional, not material to the bankruptcy and not intended to mislead the Court and its creditors. Determining whether a debtor's filing for bankruptcy protection is in good faith requires the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. *Matter of Little Creek Development Co.,* 779 F.2d 1068, 1072 (5th Cir.1986). Findings of bad faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and are based on a conglomerate of factors rather than on any single event.[10] *Id.*

6. Pursuant to 11 U.S.C. § 1107(a), a debtor-in-possession has all the rights, with narrow exceptions, of a trustee serving in a case under Chapter 11.

7. The *Morning Star* Court details what the debtor, as a fiduciary, must and cannot do. The Debtor must operate the property in good fashion, pay the expenses of operation and the costs of maintenance to preserve and protect the property, and account for the monies received and the expenses paid. *Morning Star,* at 822. However, the debtor cannot use the net funds to pay the ordinary bankruptcy costs of administration, such as attorneys' or accountants' fees. *Id. See also, In re Ranch Partners, Ltd.,* 146 B.R. 833 (D.Colo.1992).

8. The fact that the Court probably would have allowed the Debtor to use cash collateral

within the parameters of *Morning Star,* had a timely request been presented, should not be taken as this Court's approval of the Debtor's tactics in this case.

9. Bad faith as an independent "cause" for relief under § 362 is recognized by the Tenth Circuit. *See In re Nursery Land Development, Inc.,* 91 F.3d 1414, 1416 (10th Cir.1996); *In re Pacific Rim Investments, LLP,* 243 B.R. 768, 772 (D.Colo.2000).

10. In this Circuit, several factors have been identified which support a finding of a bad faith filing in a Chapter 11 case: (1) the debtor has only one asset; (2) the debtor has only one creditor; (3) the debtor acquired property which was posted for foreclosure and the prior owners had been unsuccessful

 The factors cited in *Little Creek, Nursery Land* and other like cases are not exhaustive. Individual factors, in and of themselves, may not lead to a conclusion that a bankruptcy filing is in bad faith. Bad faith is found when the cumulative effect of these individual factors together paint a factual picture that leads to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate. *In re Plumberex Specialty Products Inc.*, 311 B.R. 551, 560 (Bankr. C.D.Cal.2004); *In re Kasdorf*, 64 B.R. 294, 295 (Bankr.D.Colo.1986). This is the situation which exists in the instant case. The evidence which this Court finds significant to its conclusion that bad faith exists herein includes:

- The within case was the second bankruptcy case filed by this Debtor in less than thirteen months, the first case having been voluntarily dismissed due to the Debtor's admitted inability to confirm a plan of reorganization.
- The Property is the Debtor's sole major asset.
- The Property is fully encumbered by the lien interest of Lenox.
- The Debtor has relatively few unsecured claims which claims are small in relation to those of Lenox.
- The primary dispute in the case involves only the Debtor and one creditor, Lenox. The Court finds significant that even though this stay hearing might result in the loss of the Debtor's primary asset, no creditor other than the movant chose to oppose the requested relief.
- The Debtor has few employees (according to testimony, one individual works full-time, one individual is a part-time employee).
- The Property was subject to a pending receivership action in the State Court in which a receiver had been appointed.
- On the date of the receivership appointment, numerous checks essentially depleting the Debtor's bank accounts (including the security deposit escrow account) were written to R Homes, an insider controlled by Derek Anderson. The justification for this action, as stated by Mr. Anderson at trial was, "I panicked."
- A foreclosure against the Property was commenced by Lenox two days before the petition date.
- The Debtor's bankruptcy petition was filed the same day the State Court declined to vacate the receivership appointment order.
- Less than one month before the bankruptcy filing, the Debtor received a letter from the City of Gunnison threatening to close the apartment complex due to the structural issues relating to the failing support beams.
- There is no reasonable possibility of an effective reorganization of the Debtor. (See below.)

As best stated by the Fifth Circuit in *Little Creek*, when several of the identified "conglomerate of factors" exist:

Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the

---

in defending against the foreclosure; (4) the debtor was revitalized on the eve of foreclosure to acquire the insolvent property; (5) the debtor has no ongoing business or employees; (6) the debtor lacks a reasonable possibility of reorganization; and (7) the Chapter 11 filing stopped the foreclosure. *See Nursery Land, supra* at 1416.

debtor's "terminal euphoria." The Sixth Circuit in *Winshall Settlor's Trust,* 758 F.2d at 1137, aptly noted that "[t]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." *See In re Dolton Lodge Trust No. 35188,* 22 B.R. 918, 922 (Bankr.N.D.Ill.1982). "[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre....*" *In re Ironsides, Inc.,* 34 B.R. 337, 339 (Bankr.W.D.Ky.1983). Neither the bankruptcy courts nor the creditors should be subjected to the costs and delays of a bankruptcy proceeding under such conditions.

*Little Creek Development Co.,* 779 F.2d at 1073. Based on the above, it is the conclusion of this Court that the within case was filed in bad faith and as a result, relief from the automatic stay is appropriate under 11 U.S.C. § 362(d)(1).[11]

**B. § 362(d)(2)—Lack of Equity and Necessity for an Effective Reorganization**

Section 362(d)(2) of the Bankruptcy Code instructs the Court to grant relief from stay if, (I) the debtor does not have any equity in the property; *and* (ii) if such property is not necessary to an effective reorganization. While the parties agree the Debtor does not possess any equity in

the Property, they vehemently disagree whether the Property is necessary for an effective reorganization. Lenox asserts that even if the Court employs the Debtor's financial data, including the Debtor's purported value of the Property, the Debtor's cash flow and reserves are insufficient to service the secured debt and maintain the Property. The Debtor argues that within the next two weeks it will have firm, written commitments for postpetition financing in the approximate amount of $750,000 to $800,000 which will allow it to service the secured debt through a plan of reorganization, pay down a portion of Lenox's secured debt and continue the maintenance, repairs and revitalization of the Property.

**1. Lack of Equity.**

Notwithstanding the parties' universal disagreement as to the facts of this case, both parties appear to agree that Lenox's claim is undersecured. Jeffrey Strole, an employee and agent of Johnson Real Estate Investment, Inc., a closely-related company to Lenox, testified the secured amount owed on its claim is $5,897,365. During the hearing, the Court heard testimony that the Property value ranged from $4.4 million to $5.3 million. Thus, even had the Debtor not admitted in its pleadings that it does not have any equity in the Property, such a conclusion can be independently reached when the debt is viewed

---

**11.** Although the Court's determination the Debtor filed its petition in bad faith relies primarily on those factors set forth in *Nursery Land, Pacific Rim* and *Little Creek,* a Court nevertheless may also consider bad faith factors under § 362(d)(1), showing an intent to abuse the system and the purposes of the reorganization process. *See In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988) (citing *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984)). In this case, the Court finds additional "cause" to lift the automatic stay based on the Debtor's post-

petition conduct, including, the Debtor's (I) making of postpetition payments on prepetition debt without Court approval; (ii) inaccurate Schedules and Statement of Financial Affairs—i.e., failure to disclose payments to insiders within the 90 days prior to filing, including unsecured creditors in Schedule F that had been satisfied prepetition and listing insiders in the Debtor's list of 20 largest unsecured creditors; (iii) failure to file motions to approve executory contracts and consulting agreements; and (iv) improper use of cash collateral.

in connection with any of the offered valuations.

### 2. Not Necessary for an Effective Reorganization.

 The analysis of the second requirement of § 362(d)(2) is more problematic in this case. The burden is on the Debtor to prove the Property is "necessary to an effective reorganization." *See* 11 U.S.C. § 362(g)(2). The Debtor correctly notes the Property is the single asset of the Estate and without it, reorganization is impossible. This alone however, is not sufficient to deny Lenox's relief from stay motion. *See In re Holly's, Inc.,* 140 B.R. 643, 703–704 (Bankr.W.D.Mich. 1992). *See also Albany Partners Ltd. v. Westbrook,* 749 F.2d 670, 673 n. 7 (11th Cir.1984) ("the mere fact that the property is indispensable to the debtor's survival is insufficient.").

The seminal case addressing the standard to be applied under § 362(d)(2)(B) is *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (Timbers),* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Although *Timbers* involved a question under § 362(d)(1), it nevertheless provided the framework and analysis for evaluating relief from stay motions filed under (d)(2). According to *Timbers,* to demonstrate that property is necessary to a successful reorganization:

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts … have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*Timbers,* 484 U.S. at 375–76, 108 S.Ct. 626.

In assessing whether a debtor can prove "a reasonable possibility of a successful reorganization within a reasonable time," courts generally apply a lesser standard in determining whether the debtor has met its burden during the 120–day exclusivity period. *See In re Apex Pharmaceuticals, Inc.,* 203 B.R. 432, 441 (N.D.Ind.1996). This lesser standard has been referred to as the "sliding scale" burden of proof. However, "the use of the 'sliding scale' burden of proof is intended to benefit debtors who have a *realistic* chance of reorganization but who have not had sufficient time to formulate a confirmable plan." *Id.* at 442 (*emphasis added*).

 When relief from stay is requested near the expiration of the exclusivity period, the "sliding scale" or "moving target" burden of proof requires a greater showing than "plausibility." *In re Holly's, Inc.,* 140 B.R. at 702. Rather, "a debtor must demonstrate that a successful reorganization within a reasonable time is 'probable.'" *Id.* "Probable" has been defined as having more evidence for than against or supported by evidence which inclines the mind to believe, but leaves some room for doubt or "likely." BLACK'S LAW DICTIONARY 1201 (6th ed.1990).

 In this case, the Debtor, through the testimony of Mr. Anderson admitted that it is unable to operate and pay full debt service to Lenox as per the Note. Likewise, when the claim of Lenox is split into a secured and unsecured claim based upon the valuation of the Property, Lenox is in a blocking position with respect to the unsecured class vote in any plan. On this topic, Lenox made it clear in the trial that it intends to vote against any proposed plan. Finally, without significant new investment, the absolute priority rule will prevent the Debtor's general and limited

partners from keeping their current ownership interests.

The Debtor's plan can be easily summarized.[12] The Debtor will secure between $700,000 and $800,000 from outside sources. Approximately $500,000 of these funds will be applied to the Lenox secured obligation (valued by the Debtor at $4.4 million). The remaining Lenox balance will be paid off over thirty years at an interest rate of 5.75 % (approximate monthly payment of $22,000). The balance of the funds, as well as the net proceeds from operations[13] will be used to finance the critical improvements necessary to keep the Debtor's apartment complex open and running. The absolute priority rule will be satisfied as the ownership interest in the Debtor will be transferred to the entity(ies) or individual(s) providing the above-referenced funds. According to the Debtor, present equity will be given the opportunity to participate in these funding efforts.

The Debtor's purported plan of reorganization as described creates more unanswered questions than it provides answers. Initially, the two keys to the Debtor's outlined plan are first, a favorable valuation of the Property, and second, securing the outside funding necessary to finance the proposed plan. With respect to the former, three valuations were presented to the Court. The most recent valuation secured and issued by the Debtor immediately prior to the stay hearing, valued the Property at $4.4 million. The Debtor's own Schedules placed the value at $4.8 million taken from an earlier appraisal. Finally, a September 2001 appraisal concluded the Property was worth approximately $5.2 million. There was insufficient testimony elicited during the hearing from which this Court could make a final determination on value. However, in light of the tight cash flow generated by this Debtor,[14] particularly in light of the apparent high costs of the improvements critically necessary to continue to operate the facility, a valuation higher than $4.4 million would likely be fatal to the Debtor's plan.

More problematic is the outside funding needed if this Debtor is to succeed. Derek

---

**12.** The plan has not yet been filed. The Debtor represented its proposed plan and disclosure statement would be filed prior to the expiration of the exclusivity period (February 18, 2005), if not before. The Debtor's plan was described, in part, through the testimony of Mr. Anderson. However, a significant portion of the outline of the prospective plan was presented, not through testimony, but during closing argument.

**13.** It is unclear whether the security deposits given to the Debtor have been included in its calculation of available funds.

**14.** While there were considerable differences of opinion on the cash flow generated by the operations of the Debtor (not accounting for any payments to Lenox), the Court finds the numbers provided by the Debtor in its Schedules and monthly reports as the best source for estimates on this subject. According to its Statement of Financial Affairs ("SOFA") filed by the Debtor in its first bankruptcy case (Exhibit L), in calendar year 2002, the Debtor received $563,269 in income (an average of $46,939 per month). From the SOFA filed in October of this year in connection with the current case, the Debtor received approximately $274,000 in rent from its operations (an average of approximately, $30,400 per month). Since the filing of the within bankruptcy case, the Debtor has reported income averaging approximately $45,448 per month. Estimated operating expenses range from approximately $23,000 per month (as estimated by Glen Adams in his report), to $33,000 per month (based upon actual expenses for the first nine months of 2004). Using these figures, assuming the Debtor achieves income of $47,000 consistent with its post-filing reports and its monthly expenses run at the lower end of the identified range, the Debtor must not only succeed in securing additional financing, but it must also "hit a home run" on the valuation and interest rate arguments for its plan to have any chance on feasibility.

Anderson is the driving force behind this bankruptcy filing. He is the sole owner of PTF Holdings, the general partner of the Debtor. He also is the sole owner of Plantagenet Funding, which in turn holds 97% of the interest of R Homes, a 50% limited partner of the Debtor. On or about January 4, 2005, Mr. Anderson sent a notice of capital call to the limited partners of the Debtor (**Exhibit QQQ**), in which he indicated that the failure to meet the same will result in the conversion of their limited partner interest and that they would no longer have the right to vote or share in the profits of the partnership. While Mr. Anderson testified he had yet to take the corporate action necessary to consummate the threatened conversion, it is apparent that at the end of the day, Mr. Anderson and/or entities he controls will be in firm command of the Debtor.

Mr. Anderson's history and his testimony about his funding efforts on behalf of the Debtor are critical to the issue of the feasibility of the Debtor's plan. Mr. Anderson has been in the securities business for over 30 years. He testified he has substantial expertise in managing funds, including for some European concerns. He was very active in the Munsingwear bankruptcy case and his efforts led the unsecured creditors to receive a substantial return from that proceeding. However, the two Gunnison Center bankruptcy cases are his only experiences on the debtor side of a bankruptcy case.

Mr. Anderson testified about his efforts to secure the $700,000—$800,000 necessary to fund the Debtor's plan. He indicated he had completed preliminary contacts with six to eight funding sources, some of which are banking institutions and some are "off-shore" entities. He was unwilling at trial to disclose any details about these contacts. No written commitments have been received as a result of Mr.

Anderson's efforts to date. No written investment materials about the Property have been developed and circulated as part of the Debtor's funding effort. In fact, Mr. Anderson admits the mechanism through which the Debtor will receive the funds has yet to be defined. It is unclear whether the monies would be loaned to Mr. Anderson, to an entity Mr. Anderson creates, or invested in or loaned to the Debtor directly.

Cross examination revealed the only assurance of success of the funding efforts is based upon Mr. Anderson's expressed confidence in his ability to do so. With all due respect to Mr. Anderson, this "trust me" approach is insufficient to give the Court comfort that the proposed funding will come to fruition. Even further doubt exists because the Debtor has not secured additional investment in the months subsequent to the dismissal of its first bankruptcy case. It appears that the Debtor's efforts at this time are simply a case of "too little, too late."

The plan as described also presents other major concerns as to feasibility. According to the Debtor, the unsecured claim of Lenox will be placed in a separate unsecured class, presumably to facilitate a potential favorable vote in the other unsecured class, thus satisfying the requirements of 11 U.S.C. § 1126(c). Whether this approach is proper and legal under the Bankruptcy Code is an issue for another day. However, such an approach has been restricted in other cases. *See e.g., Boston Post Road Ltd. Partnership v. F.D.I.C. (In re Post Road Ltd. Partnership)*, 21 F.3d 477, 483 (2nd Cir.1994); *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154, 159–60 (3rd Cir.1993); *Lumber Exch. Bldg. Ltd. Partnership v. Mutual Life Ins. Co. (In re Lumber Exch. Bldg. Ltd. Partnership)*, 968 F.2d 647, 649 (8th Cir.

1992); *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 502 (4th Cir.1992); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (Matter of Greystone III Joint Venture)*, 995 F.2d 1274, 1278–1279 (5th Cir.1991). Likewise, while the Debtor has proposed a 5.75% interest rate to be paid on the restructured Lenox claim, it has not yet been established whether this rate is consistent with the dictates of applicable law.

Based upon the evidence, this Court can reach no conclusion but that the Debtor has failed to meet its burden of proof as to the feasibility of its prospective plan of reorganization. The testimony presented does not indicate that a successful plan is "probable," or even "plausible." As a result, the second prong of § 362(d)(2) has been met and Lenox is entitled to relief from the automatic stay.

## IV. CONCLUSION

For the above reasons, this Court concludes Lenox is entitled to its requested relief as the Debtor has failed to satisfy its burdens of proof as required by § 362(g). It is therefore

ORDERED that Lenox is hereby granted relief from the automatic stay pursuant to § 362(d)(1), including bad faith, and (d)(2).